# EXHIBIT 2

## Complaint in Intervention for Declaratory and Injunctive Relief

Nicole D. Klobas
[*Pro Hac Vice Motion Forthcoming*]
Arizona Department of Water Resources
1110 West Washington Street, Suite 310
Phoenix, Arizona 85007
(602) 771-8477
ndklobas@azwater.gov

Jeffrey B. Wall
[*Pro Hac Vice Motion Forthcoming*]
Morgan R. Ratner
[*Pro Hac Vice Motion Forthcoming*]
Gibson, Dunn & Crutcher LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500
jwall@gibsondunn.com
mratner@gibsondunn.com

Gregg J. Costa
[*Pro Hac Vice Motion Forthcoming*]
Gibson, Dunn & Crutcher LLP
811 Main Street, Suite 3000
Houston, Texas 77002
(346) 718-6600
gcosta@gibsondunn.com

Mark A. Hutchison (Bar No. 4639)
Hutchison & Steffen, PLLC
10080 W. Alta Drive, Suite 200
Las Vegas, Nevada 89145
(702) 385-2500
mhutchison@hutchlegal.com

Joseph C. Reynolds (Bar No. 8630)
Hutchison & Steffen, PLLC
100 W. Liberty Street, Suite 765
Reno, Nevada 89501
(775) 853-8746
jreynolds@hutchlegal.com

Yaira Dubin
[*Pro Hac Vice Motion Forthcoming*]
Parisa Sadeghi
[*Pro Hac Vice Motion Forthcoming*]
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, New York 10166
(212) 351-4000
ydubin@gibsondunn.com
psadeghi@gibsondunn.com

Stephen J. Hammer
[*Pro Hac Vice Motion Forthcoming*]
Gibson, Dunn & Crutcher LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201
(214) 698-3100
shammer@gibsondunn.com

*Attorneys for Plaintiff-Intervenor*
*State of Arizona*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| STATE OF NEVADA, COLORADO RIVER COMMISSION OF NEVADA, and SOUTHERN NEVADA WATER AUTHORITY,<br><br>Plaintiffs,<br><br>v. | Case No. 26-cv-2665<br><br>**COMPLAINT IN INTERVENTION FOR DECLARATORY AND INJUNCTIVE RELIEF** |

DOUGLAS BURGUM, Secretary of the Interior, in his official capacity as Secretary of the Department of the Interior; U.S. Department of the Interior; U.S. Bureau of Reclamation; and AUBREY BETTENCOURT, in her official capacity exercising the delegated authority of the Commissioner of the U.S. Bureau of Reclamation,

Defendants.

Intervenor-Plaintiff State of Arizona, by and through the Director of the Arizona Department of Water Resources, respectfully submits this Complaint in Intervention for declaratory and injunctive relief under the Administrative Procedure Act, against Defendants the U.S. Department of the Interior, the U.S. Bureau of Reclamation, Secretary of the Interior Douglas Burgum, and Principal Deputy Commissioner of the U.S. Bureau of Reclamation Aubrey Bettencourt. Arizona challenges three related final agency actions governing the Department of the Interior and Bureau of Reclamation's post-2026 operation of the Colorado River: the Final Environmental Impact Statement, the Record of Decision, and the 2027-2028 Guidelines. In support, Intervenor states as follows:

**INTRODUCTION**

1. This suit concerns the rights and obligations surrounding the waters of the Colorado River and the federal government's statutory responsibility to respect those rights. The backdrop for this suit dates back a century, when the seven States of the Colorado River Basin—Arizona, California, Colorado, Nevada, New Mexico, Utah, Wyoming—met to establish a legal framework for use of the River. That framework, in combination with subsequent federal statutes, continues to govern the States' use and the federal government's management of the River today.

2. In 1922, then-Secretary of Commerce Herbert Hoover led representatives from the seven States of the Colorado River Basin to a landmark agreement over their rights and obligations surrounding the River: the 1922 Colorado River Compact. The Compact delineated the Upper Basin and the Lower Basin, with the division at Lee Ferry in northern Arizona. The Compact then allocated water to the Upper Division States (Colorado, New Mexico, Utah, and Wyoming, described interchangeably herein as the "Upper Division States," the "Upper Basin States," or the "Upper Basin") and the Lower Division States (Arizona, California, and Nevada, described interchangeably herein as

the "Lower Division States," the "Lower Basin States," or the "Lower Basin"). Critically, it also required the Upper Basin to deliver a minimum volume of water—combined with current treaty obligations, at least 82.5 million acre-feet—to its downstream neighbors on a rolling ten-year basis. Congress soon ratified the 1922 Compact, giving it the status of federal law.

3. The 1922 Compact is the cornerstone of subsequent laws, regulations, and contracts governing the use and administration of the Colorado River. Collectively, that body of law is known as the "Law of the River." Most relevant here are the Boulder Canyon Project Act of 1928, which ratified the 1922 Compact and authorized the construction of a major dam in the Lower Basin; and the Colorado River Storage Project Act of 1956 and Colorado River Basin Project Act of 1968, which together authorized the construction, operation, and maintenance of federally managed reservoirs in the Upper Basin. Across those Acts, Congress has consistently directed that, in operating federally managed dams and reservoirs, the federal government must treat the 1922 Compact as its North Star. For example, in the 1956 Act, Congress directed the Secretary "to comply with the applicable provisions of the Colorado River Compact . . . in the storage and release of water from reservoirs in the Colorado River Basin." 43 U.S.C. § 620m. In the 1968 Act, Congress required the Secretary to adopt operating criteria "[i]n order to comply with and carry out the provisions of the Colorado River Compact." *Id.* § 1552(a).

4. For decades, the Department of the Interior generally complied with its statutory mandate and conducted Colorado River operations pursuant to federal regulations that provide for the annual release of at least 8.23 million acre-feet of water from Lake Powell to Lake Mead. That release, in combination with inflows below Lake Powell and above Lee Ferry, enabled compliance with the 1922 Compact, which requires that the Upper Basin deliver at least 8.25 million acre-feet of water per year, on average, to the Lower Basin.

5. In recent years, the Colorado River Basin has experienced significant drought conditions. Those conditions have put added pressure on the River's resources and have underscored the Lower Basin's need for its bargained-for water deliveries. But instead of responding with release decisions centered around Compact compliance, Interior has ignored its obligations under the Law of the River. In August 2026, Interior, acting through the Bureau of Reclamation, issued a series of final

agency actions that specifically disavow any attempt to comply with the Law of the River, including the cornerstone 1922 Compact. The agency has snuffed out its North Star.

6. The challenged regulatory actions provide the framework for Reclamation's administration of facilities along the Colorado River for the next ten years. Three discrete but related agency actions are at issue: (1) the Final Environmental Impact Statement (Final EIS), in which Reclamation specified the limited universe of frameworks from which it would ultimately select the framework governing River administration; (2) the Record of Decision (ROD), in which Reclamation chose one framework from among those options; and (3) the 2027-2028 Guidelines, in which Reclamation applied that chosen framework to the next two years.

7. Collectively, this nesting doll of agency actions will determine how much water the federal government releases from Lake Powell to Lake Mead, which will in turn determine how much water the Upper Basin States deliver to the Lower Basin States. And in making those determinations, compliance with the 1922 Compact is nowhere to be found.

8. Instead, Reclamation effectively ignored the Law of the River in selecting a menu of operational frameworks for the next ten years (the Final EIS), ignored it again in selecting one of those frameworks (the ROD), and ignored it a third time in applying the chosen framework to come up with a plan for the next two years (the 2027-2028 Guidelines). Rather than considering whether each of those actions would ensure compliance with the Law of the River, Reclamation chose frameworks that would authorize releases at levels that will guarantee *violations* of the Law of the River, and specifically the 1922 Compact's delivery obligation. That is a straightforward contravention of the agency's statutory obligations, in violation of the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A), (C).

9. That is not all. In issuing the challenged actions, Reclamation also failed to satisfy the APA's procedural requirements. It did not address the other core concerns that Arizona raised in the comment process, including the devastating effects of Reclamation's proposals on Arizonans and Arizona's economy; the flawed models underlying Reclamation's frameworks; and the failure to give proper consideration to the Lower Basin's proposal, which (unlike Reclamation's proposals) pursued compliance with the Law of the River despite system constraints. The agency did so in violation of the

APA's requirement to engage in reasoned decision-making, 5 U.S.C. § 706(2)(A), and in violation of the requirements of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*

10. For each of these reasons, the challenged actions are contrary to law, are arbitrary and capricious, and were issued without observance of procedure required by law, in violation of the APA, NEPA, and the Law of the River.

11. Arizona requests a declaratory judgment that the Final EIS, ROD, and 2027-2028 Guidelines are unlawful under the APA, NEPA, and the Law of the River, *see* 5 U.S.C. § 703; vacatur of the Final EIS and ROD under the APA, *see id.* § 706; and an injunction preventing further enforcement of the Final EIS and ROD.

12. By contrast, Arizona requests that this Court remand without vacating the 2027-2028 Guidelines. *See Cal. Cmtys. Against Toxics* v. *EPA*, 688 F.3d 989, 992 (9th Cir. 2012). Those Guidelines suffer from the same fatal deficiencies as the Final EIS and the ROD. But unless they go into effect, the States of the Colorado River Basin will have no guidance on how Reclamation plans to administer the reservoirs along the River for the next two years. And without such guidance, the States can neither appropriately operate today nor plan for the future, including for any shortages that will result from violations of the 1922 Compact. In short, Arizona water users must be able to anticipate how much—or how little—water they will have in the next two years so they can make difficult decisions about how to manage what water they receive. Vacatur of the 2027-2028 Guidelines would make that task impossible. Given the "disruptive consequences" of vacatur, *id.*, Arizona therefore asks this Court to remand the 2027-2028 Guidelines without vacating them.

**PARTIES**

13. Plaintiff the State of Arizona is a sovereign state of the United States of America. Arizona proceeds by and through the Director of the Arizona Department of Water Resources, who is charged by statute with the duty to "[p]rosecute and defend all rights, claims and privileges of [Arizona] respecting interstate streams." Ariz. Rev. Stat. § 45-105(A)(9).

14. Defendant United States Department of the Interior is a U.S. governmental agency headquartered in Washington, D.C. The Department is subject to the Administrative Procedure Act. 5 U.S.C. §§ 551(1), 702.

15. Defendant United States Bureau of Reclamation is an administrative agency within the United States Department of the Interior that oversees water resource management in the United States. The Bureau of Reclamation is headquartered in Washington, D.C. It is subject to the Administrative Procedure Act. 5 U.S.C. §§ 551(1), 702.

16. Defendant Douglas Burgum is the Secretary of the Interior and is being sued in his official capacity. In that capacity, Secretary Burgum has the authority to prescribe rules and regulations for carrying out the Reclamation Act. 43 U.S.C. § 373.

17. Defendant Aubrey J.D. Bettencourt is the Principal Deputy Commissioner for the Bureau of Reclamation and is being sued in her official capacity.

**JURISDICTION AND VENUE**

18. Plaintiff brings this action under the Administrative Procedure Act, 5 U.S.C. § 702. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff's causes of action arise under the laws of the United States, including the APA, NEPA, the 1922 Compact, the Boulder Canyon Project Act, the Colorado River Storage Project Act, and the Colorado River Basin Project Act.

19. Venue is proper under 28 U.S.C. § 1391(e)(1) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

**LEGAL BACKGROUND**

20. This suit concerns the laws that govern the Colorado River Basin. The Colorado River flows in a southwesterly direction from north-central Colorado to the Gulf of California. Over the course of its roughly 1,400-mile journey, the River winds through western Colorado, across Utah, through Arizona, along Arizona's borders with Nevada, California, and Mexico, and then crosses into Mexico.

21. The Colorado River Basin is expansive: It drains an area of roughly 242,000 square miles, *see Arizona* v. *California*, 373 U.S. 546, 552 (1963) (*Arizona IV*), and includes territory of seven different States—Arizona, California, Colorado, Nevada, New Mexico, Utah, and Wyoming. Today, the River provides water to roughly 40 million residents of the Basin and irrigates nearly 5.5 million acres of land. *See* Bureau of Reclamation, *Colorado River Basin Water Supply and Demand Study—*

*Executive Summary* 3 (Dec. 2012).

22. A canyon section spanning from southern Utah to northern Arizona divides the "Upper Basin" from the "Lower Basin." The Upper Basin principally includes parts of Colorado, New Mexico, Utah, and Wyoming. The Lower Basin principally includes parts of Arizona, California, and Nevada. A very small portion of Arizona lies in the Upper Basin, but Arizona has historically been considered a "Lower Basin State."




Ex. A (Final EIS (July 2026)) at ES-2.

23. A robust body of law has developed to define the rights and obligations of the States and the federal government with respect to the Colorado River. That body of law is referred to as the "Law of the River." Reclamation defines the "Law of the River" to include the "treaties, compacts, decrees, statutes, regulations, contracts, and other legal documents and agreements applicable to the allocation, appropriation, development, exportation, and management of the waters of the Basin." Ex. B (Post-2026 Colorado River Reservoir Operations Alternatives Report (Jan. 2025)) at 5 n.5.

24. The cornerstone of the Law of the River is the Colorado River Compact of 1922. The Compact allocates the River's water to the Upper and Lower Basins, and it dictates how much water the upstream States must deliver to their downstream neighbors on a regular basis. Subsequent legislative enactments established the federal government's role in administering the waters of the Colorado River. Those enactments require the federal government to exercise its authority in accordance with the 1922 Compact and the Law of the River.

**A. The 1922 Colorado River Compact establishes the foundation of the Law of the River.**

25. In 1921, Congress authorized representatives from the States of the Colorado River Basin and a federal representative to negotiate an interstate compact to allocate "the water supply of the Colorado River." 42 Stat. 171, 172. These representatives were collectively known as the Colorado River Commission. Then-Secretary of Commerce Herbert Hoover served as the federal representative and the Commission's Chairman.

26. The Commissioners' principal challenge was to reconcile the competing objectives of the Upper and Lower Basins. The Lower Basin's primary interest was in securing consistent and sufficient access to water from the Colorado River. The States in the Lower Basin needed that water to support the explosive growth the region was experiencing. But geography meant the Lower Basin's *physical* access to water depended in part on the Upper Basin's actions: If the Upper Basin hoarded water from the Colorado River, the Lower Basin would be left with less than it needed to sustain its growth.

27. The Upper Basin had different concerns, driven by *legal* access under the then-prevailing law of "prior appropriation." Under that "first in time, first in right" doctrine, "[t]he

Gibson, Dunn & Crutcher LLP

diversion [of water] from [a] stream and the application of the water to a beneficial purpose constituted an appropriation, and the appropriator was treated as acquiring a continuing right to divert and use the water to the extent of his appropriation." *Wyoming* v. *Colorado*, 259 U.S. 419, 459 (1922). The prior-appropriation doctrine troubled the Upper Basin States because it was widely expected that "[t]he upper basin w[ould] be slower of development than the lower basin." *Analysis by Hon. Herbert Hoover*, 64 Cong. Rec. 2710-2713 (1923), *reprinted in* H.R. Doc. No. 717, 80th Cong., 2d Sess. A32 (1948) (*Hoover Analysis*). Under the prior-appropriation doctrine, the Lower Basin's greater immediate usage would afford the Lower Basin rights over much (if not most) of the River in perpetuity.

28. The 1922 Compact accommodated both Basins' concerns. The Compact divides the Colorado River Basin into an Upper Basin and a Lower Basin and uses Lee Ferry, which is a point near a historically important river crossing in northern Arizona, to mark the division between the two. *See* 1922 Compact, art. II(e)-(g). The Compact allocates a supply of water to each Basin, and it requires the Upper Basin to deliver a minimum amount of water at Lee Ferry for use by the downstream Lower Basin.

29. Paragraphs (a) and (b) of Article III establish the first part of that compromise. Paragraph (a) provides that both the Upper Basin and Lower Basin are "apportioned from the Colorado River System in perpetuity" "the exclusive beneficial consumptive use of 7,500,000 acre feet of water per annum." 1922 Compact, art. III(a).[1] Paragraph (b) increases the Lower Basin's potential allocation to 8.5 million acre-feet by giving it the "right to increase its beneficial consumptive use of such waters by one million acre feet per annum." By allocating water to each Basin, paragraphs (a) and (b) addressed the Upper Basin's concerns that the greater immediate usage of the Lower Basin would allow it to lay permanent legal claim to as much water as it could use in the short term.

30. Paragraph (d), in turn, addresses the Lower Basin's concerns by requiring the Upper Basin to deliver a minimum volume of water to the Lower Basin on a regular basis. Specifically, it provides that the "States of the Upper Division will not cause the flow of the river at Lee Ferry to be depleted below an aggregate of 75,000,000 acre feet for any period of ten consecutive years reckoned

---

[1] "'Beneficial consumptive use' means consumptive use measured by diversions less return flows, for a beneficial (nonwasteful) purpose." *Arizona IV*, 373 U.S. at 557 n.23.

Gibson, Dunn & Crutcher LLP

in continuing progressive series beginning with the first day of October next succeeding the ratification of this compact." 1922 Compact, art. III(d). In other words, paragraph (d) "require[s]" an "average annual delivery of water at Lee Ferry" of 7.5 million acre-feet. *Arizona IV*, 373 U.S. at 558-59.

31. The Commissioners understood that paragraph (d) would give the Lower Basin priority of access to water in dry years. Secretary Hoover explained that paragraph (d) "fixes a definite quantity of water which must pass that point" and establishes that in the event of a deficiency, "the lower basin has the first call on the water up to a total use of 75,000,000 acre-feet each 10 years." *Hoover Analysis* A34. In periods of low flow, the Upper Basin would therefore need to curtail its own use to satisfy paragraph (d)'s delivery obligation.

32. The Upper Basin's delivery obligation in paragraph (d) is supplemented by an additional delivery obligation for the benefit of Mexico. That obligation is set out in paragraph (c), which provides that if the United States recognizes Mexico's "right to the use of any waters of the Colorado River System, such waters shall be supplied first from the waters which are surplus over and above the aggregate of the quantities specified in paragraphs (a) and (b)." 1922 Compact, art. III(c). If that surplus "prove[s] insufficient . . . the burden of such deficiency shall be equally borne by the Upper Basin and the Lower Basin, and whenever necessary the States of the Upper Division shall deliver at Lee Ferry water to supply one-half of the deficiency so recognized in addition to that provided in paragraph (d)." *Ibid.*

33. In 1944, the United States entered into a treaty with Mexico obligating the United States to deliver to Mexico at specified locations along the border a "guaranteed annual quantity" of 1.5 million acre-feet from the Colorado River. 1944 U.S.-Mexico Water Treaty, § III, art. 10(a).

34. Under paragraph (c), the Upper Basin's obligation to deliver water at Lee Ferry for Mexico's benefit depends on the River's natural flow in any given year. If the River's natural flow is sufficient to supply both Basins' allocations under paragraphs (a) and (b)—7.5 and 8.5 million acre-feet for the Upper and Lower Basins, respectively—and the 1.5 million acre-feet owed to Mexico, the Upper Basin must ensure that the full Mexico allocation arrives at Lee Ferry so that it can pass downstream to Mexico. But if the River's natural flow is too low to supply the full allocation for each Basin and Mexico, then the Upper Basin must deliver at least half of the Mexico allocation at Lee

Ferry—at a minimum, 0.75 million acre-feet.

35. The upshot is this: Over a ten-year period, paragraph (c) requires the Upper Basin to deliver at Lee Ferry at least 7.5 million acre-feet for Mexico's use (augmented based on any years of surplus and to account for evaporative and other transit losses), over and above the 75 million acre-feet paragraph (d) requires for the Lower Basin's use. Together, that means that the Upper Basin must deliver at Lee Ferry a minimum total of 82.5 million acre-feet on a rolling, ten-year basis. That 82.5-million-acre-foot guarantee is the 1922 Compact's basic promise to the Lower Basin.

**B. Subsequent enactments and agreements establish the federal government's role in ensuring Compact compliance.**

36. Since 1922, additional legislation and agreements have built on the Compact's foundation and have further delineated rights and obligations respecting the Colorado River. Each of these developments confirms the 1922 Compact's delivery obligation, authorizes infrastructure in support of that obligation, and establishes additional guidelines to ensure satisfaction of that obligation. These subsequent enactments have swept the federal government into the seven-State agreement, making it the federal government's responsibility to operate federal infrastructure in a way that ensures continued compliance with the Compact.

***Boulder Canyon Project Act of 1928***

37. In 1928, Congress enacted the Boulder Canyon Project Act. That Act ratified the 1922 Compact and rendered it "the law of the land, much like any other federal statute." *Texas* v. *New Mexico*, 602 U.S. 943, 950 (2024); Boulder Canyon Project Act, ch. 42, § 13, 45 Stat. 1057, 1064 (codified at 43 U.S.C. § 617*l*(a)). The 1928 Act also confirmed the 1922 Compact's status as the cornerstone of the Law of the River. It provided that the "rights of the United States in or to waters of the Colorado River . . . shall be subject to and controlled by said Colorado River compact." 43 U.S.C. § 617*l*(b).

38. The 1928 Act took an initial step toward establishing the federal government's role in managing the River. Specifically, the Act authorized "the Secretary of the Interior subject to the terms of the Colorado River compact . . . to construct, operate, and maintain a dam and incidental works in the main stream of the Colorado River" at Boulder Canyon. 43 U.S.C. § 617. That dam became

Hoover Dam, which today impounds Lake Mead, a large reservoir in the Lower Basin.

39. In conferring that authority, Congress repeatedly emphasized that the federal government must exercise its authority in compliance with the 1922 Compact. Section 617g provides that "[t]he United States . . . shall observe and be subject to and controlled by said Colorado River compact in the construction, management, and operation of said reservoir, canals, and other works and the storage, diversion, delivery, and use of water for the generation of power, irrigation, and other purposes." 43 U.S.C. § 617g(a). Section 617e likewise specifies that the dam and reservoir are to be used "in pursuance of Article VIII of [the] Colorado River compact." *Id.* § 617e.

40. The 1928 Act also provided consent for the States to enter into further agreements. But again, that consent was subject to the 1922 Compact: The States of the Colorado River Basin were authorized to "negotiate and enter into compacts or agreements" only "in conformity with the Colorado River compact." 43 U.S.C. § 617r. As relevant here, the Act authorized Arizona, California, and Nevada to enter an agreement apportioning their allocation under the Compact. 45 Stat. at 1059.[2]

***Upper Colorado River Basin Compact of 1948***

41. In 1948, the States of the Upper Basin negotiated a Compact to "apportion[ ] the use of the waters of the Colorado River" among themselves, and to "establish the obligations of each [Upper Basin] State . . . with respect to the deliveries of water required to be made at Lee Ferry by the Colorado River Compact." Upper Colorado River Basin Compact, 1948, art. I(a).[3]

42. Article IV of the 1948 Compact underscores the Upper Basin's delivery obligation by providing additional guidelines for curtailment "necessary" to satisfy that obligation. 1948 Compact, art. IV. Specifically, it establishes how the burden of any curtailment should be borne by the Upper

[2] In 1964, the Supreme Court issued a consent decree in *Arizona* v. *California* that confirmed the apportionments of Colorado River water among the Lower Basin States authorized in the Boulder Canyon Project Act and Secretarial contracts: Of the first 7.5 million acre-feet available for release in a year, 4.4 million acre-feet was apportioned to California, 2.8 million acre-feet to Arizona, and 300,000 acre-feet to Nevada, with Arizona and California splitting any water in excess of 7.5 million acre-feet. 376 U.S. 340, 342 (1964); *see* Consolidated Decree, *Arizona* v. *California*, 547 U.S. 150 (2006).

[3] Because a small portion of Arizona is located in the Upper Basin, *see* ¶ 22, *supra*, the 1948 Compact also allocates to Arizona 50,000 acre-feet of water from the Upper Basin's total allocation, *see* 1948 Compact, art. III(a)(1).

Gibson, Dunn & Crutcher LLP

Basin States: States that have exceeded their allocations in the years preceding necessary curtailment must reduce their use first "before demand is made on any other State of the Upper Division." *Id.* art. IV(b).

43. Article IX of the 1948 Compact addresses the federal government. It recognizes the federal government's rights to administer and operate construction along the Colorado River, while acknowledging that the government must do so in compliance with the 1922 Compact. Paragraph (a) of that article provides that "[n]o State shall deny the right of the United States of America . . . to construct or participate in the construction and use of diversion works and storage reservoirs with appurtenant works, canals and conduits in one State for the purpose of diverting, conveying, storing, regulating and releasing water *to satisfy the provisions of the Colorado River Compact relating to the obligation of the States of the Upper Division to make deliveries of water at Lee Ferry*." 1948 Compact, art. IX(a) (emphasis added).

***Colorado River Storage Project Act of 1956***

44. In the Colorado River Storage Project Act of 1956, Congress gave the Secretary of the Interior additional authority over facilities along the Colorado River. Congress authorized the construction, operation, and maintenance of four major reservoirs in the Upper Basin—the Aspinall Unit (originally the Curecanti Unit), Flaming Gorge, Navajo, and Glen Canyon, which today impounds Lake Powell. *See* Colorado River Storage Project Act of 1956, ch. 203, § 1, 70 Stat. 105, 106 (codified at 43 U.S.C. § 620 *et seq.*). The Aspinall Unit, Flaming Gorge, and Navajo are collectively known as the "Upper Initial Units."

45. In the Storage Project Act, Congress again directed the federal government to comply with the 1922 Compact and the Law of the River in exercising its statutory authority and duties. The Act expressly provides that in "operat[ing] and maintain[ing]" the reservoirs, the government "is directed to comply with the applicable provisions of the Colorado River Compact . . . and the Treaty with the United Mexican States, in the storage and release of water from reservoirs in the Colorado River Basin." 43 U.S.C. § 620m.

***Colorado River Basin Project Act of 1968***

46. In 1968, Congress passed the Colorado River Basin Project Act. Pub. L. No. 90-537, 82 Stat. 885 (codified at 43 U.S.C. § 1501 *et seq.*). That Act authorizes the Central Arizona Project—a 336-mile aqueduct system through which Colorado River water reaches Maricopa, Pinal, and Pima Counties in Arizona, which the Act calls "water-deficient areas of Arizona." 43 U.S.C. § 1521(a).

47. Congress provided that in "the operation and maintenance of all facilities in the Colorado River system," "[a]ll Federal officers and agencies are directed to comply with" "the Colorado River Compact" and the "Water Treaty of 1944," among other components of the Law of the River. 43 U.S.C. § 1551(a), (c).

48. The Colorado River Basin Project Act directed the Interior Secretary to devise "criteria" for the long-range operation of storage units on the Colorado River and releases from the Lake Powell reservoir. 43 U.S.C. § 1552. In Section 602(a), Congress specified the purpose of those operational criteria: "to comply with and carry out *the provisions of the Colorado River Compact* . . . and the Mexican Water Treaty." *Id.* § 1552(a) (emphasis added). It accordingly instructed that in establishing the operating criteria, the federal government must "make provision for the storage of water in storage units . . . and releases of water from Lake Powell" in a specific "order of priority": (1) "releases to supply one-half the deficiency described in article III(c) of the Colorado River Compact," meaning to satisfy the Upper Basin's delivery obligation to Mexico; (2) "releases to comply with article III(d) of the Colorado River Compact," meaning to satisfy the Upper Basin's delivery obligation to the Lower Basin; and (3) "storage of water not required for the releases." *Ibid.*

49. In 1970, pursuant to the Act, the Department of the Interior promulgated the Long-Range Operating Criteria. *See* Coordinated Long-Range Operation, 35 Fed. Reg. 8,951-52 (June 10, 1970). As the name suggests, the Long-Range Operating Criteria contain the criteria the government must use when releasing water from Lake Powell (*i.e.*, at the Glen Canyon Dam) to Lake Mead (*i.e.*, at the Hoover Dam).

50. The Long-Range Operating Criteria directly affect the Upper Basin's delivery obligation under the 1922 Compact. The Upper Basin is ultimately responsible for delivering a Compact-compliant volume of water at Lee Ferry. 1922 Compact, art. III(c)-(d). But because Lake

Powell sits upstream from Lee Ferry and Lake Mead sits downstream from it, the Upper Basin's ability to make good on its Compact promise hinges in part on the federal government's releasing sufficient water from Lake Powell to Lake Mead. That is why, as discussed, Congress provided that Interior must prioritize "compl[iance] with article III(d) of the Colorado River Compact"—the Upper Basin delivery obligation—in establishing criteria for administering its Lake Powell releases. 43 U.S.C. § 1552(a)(2).

51. To ensure compliance with that statutory mandate and the 1922 Compact, the Long-Range Operating Criteria provide that "the objective shall be to maintain a minimum release of water from Lake Powell of 8.23 million acre-feet" per year. 35 Fed. Reg. at 8,951 § II(2). That minimum release combines with small inflows downstream of Lake Powell and upstream of Lee Ferry, to enable a Compact-compliant, 8.25-million-acre-foot delivery at Lee Ferry. The Long-Range Operating Criteria further provide that in some years, "water shall be released . . . at a rate greater than 8.23 million acre-feet per year." *Id.* § II(3); *see Colorado River Interim Guidelines for Lower Basin Shortages and Coordinated Operations for Lake Powell and Lake Mead*, adopted by Record of Decision in December 2007, 73 Fed. Reg. 19,873, 19,879 (Apr. 11, 2008) (2007 Guidelines) (noting that historically "there were effectively only two operational tiers" for release of water from Lake Powell: "a minimum objective release of 8.23 [million acre-feet] per year or releases greater due to equalization or spill avoidance"). The operating criteria thus reflect the Colorado River Basin Project Act's directive that the federal government prioritize compliance with the Upper Basin's delivery obligation at Lee Ferry.

**C. The federal government takes further regulatory action pursuant to its authority under the Law of the River.**

52. In recent years, the States and federal government have contended with severe drought conditions in the Colorado River Basin. The decades since 2000 are estimated to be "the second driest period of record" in the Basin. Ex. C (Lower Division States Scoping Letter (Aug. 15, 2023)) at 1. Since the onset of the drought, the Basin's primary reservoirs—Lake Powell and Lake Mead—have fallen to historically low elevations. *See* Ex. D (Draft EIS (Jan. 2026)) at ES-1. From 2020 to 2024, the average flow of water at Lee Ferry was more than 3 million acre-feet less per year than the average

flow from 1906 to 2020. *See* Bureau of Reclamation, Colorado River Basin Natural Flow and Salt Data.

53. Reclamation took three major regulatory actions to adapt its management of the Colorado River in response to these drought conditions.

***2007 Guidelines***

54. First, Reclamation promulgated an updated set of guidelines—the 2007 Guidelines—for its operation of Lake Powell and Lake Mead. In most operating conditions, the 2007 Guidelines required an annual release of at least 8.23 million acre-feet from Lake Powell, with greater releases when storage conditions permitted and reduced ones when conditions required. *See* 2007 Guidelines § 6. The 2007 Guidelines also defined graduated shortage tiers for the Lower Basin, keyed to Lake Mead's elevation. *Id.* § 2.D. Arizona agreed to contribute between 320,000 and 480,000 acre-feet per year, depending on the Lake's elevation. *Id.* Additionally, the 2007 Guidelines created the Intentionally Created Surplus program, which allowed water users from the Lower Basin to conserve water and store it in Lake Mead for future delivery. *Id.* § 3.

55. Under the 2007 Guidelines and companion programs, Lower Basin water users conserved and contributed an additional 5.1 million acre-feet of water in Lake Mead by October 2023, raising its elevation by 72 feet. Ex. C at 2; *see* Ex. E (Reclamation Scoping Report for Post-2026 Reservoir Operations (Oct. 2023)) at 60.

56. These Guidelines govern operations only through the end of 2026. *See* 2007 Guidelines, Part II ("The Guidelines would remain in effect for determinations to be made through 2025 regarding water supply and reservoir operating decisions through 2026."); *id.* § 8.A, C.

***2019 Drought Contingency Plans***

57. The 2007 Guidelines could not keep pace with the drought. It became clear that additional responsive actions were needed to supplement the 2007 Guidelines. So in 2019, pursuant to a statute authorizing the Secretary and the Basin States to strike a short-term deal to contend with drought conditions, the States of each Basin agreed to "Drought Contingency Plans" governing water use for that Basin. Colorado River Drought Contingency Plan Authorization Act, Pub. L. No. 116-14, 133 Stat. 850 (2019).

58. Under the Lower Basin Drought Contingency Plan, Arizona, California, and Nevada committed to contribute additional water to Lake Mead, beyond the 2007 Guidelines' shortage reductions. Arizona agreed to contribute 192,000 acre-feet per year, bringing its total shortage contributions to 512,000 acre-feet per year (and 240,000 acre-feet per year at the lowest elevations, which would bring its total to 720,000 acre-feet per year in those years). Under the Upper Basin plan, the Interior Secretary and the Upper Basin States agreed to coordinate drought-response releases from the Colorado River Storage Project's Upper Initial Units—the storage units upstream of Lake Powell authorized by the Colorado River Storage Project Act of 1956—to protect critical elevation levels at Lake Powell. Notably, the Upper Basin States did not agree to any concrete reductions. Like the 2007 Guidelines, the Drought Contingency Plans run through 2026.

***Near-Term Supplemental EIS and ROD***

59. In 2024, to address the potential for continued drought conditions in the Basin, Reclamation released a Supplemental EIS for Near-Term Colorado River Operations and a corresponding Record of Decision. *See* Ex. F (ROD (May 2024)). The 2024 ROD made limited adjustments to Glen Canyon Dam and Hoover Dam operations. *Id.* at 2. The 2024 ROD limited "tier-based reductions and contributions" to those under the 2007 Guidelines, *id.* at 4, but required the Lower Basin States to target conserving an additional 3 million acre-feet of water and authorized releases at a new low of 6 million acre-feet depending on elevations in Lake Powell, *id.* at 16-17.

**FACTUAL BACKGROUND AND ALLEGATIONS**

60. The imminent expiration of the 2007 Guidelines and 2019 Drought Contingency Plans, and the urgent need for a replacement framework, precipitated the challenged regulatory actions. Those agency actions constitute Reclamation's chosen replacement framework for its management of the Colorado River. The Final Environmental Impact Statement (Final EIS) contains the menu of operational frameworks Reclamation provided for itself. The Record of Decision (ROD) is the framework that Reclamation chose from that menu. And the 2027-2028 Guidelines apply the ROD to provide specific criteria for the federal administration of Lake Powell and Lake Mead over the next two years.

61. The Final EIS, ROD, and 2027-2028 Guidelines are fundamentally flawed and legally

deficient for several reasons.

62. *First*, each of those actions is contrary to the Law of the River. None of the frameworks in the Final EIS includes reasonable steps to ensure that Compact deliveries are made. In fact, the framework the ROD selected, as well as the criteria in the 2027-2028 Guidelines, expressly contemplate a *violation* of the 1922 Compact's delivery obligation and the Long-Range Operating Criteria by authorizing releases that would result in the delivery of under 82.5 million acre-feet on a rolling ten-year basis. The frameworks in the Final EIS and adopted in the ROD and 2027-2028 Guidelines also do not account for the Upper Basin States' duty to curtail their own use to comply with the Law of the River, and instead place the disproportionate burden of curtailment on the Lower Basin. That flips the priority of the Law of the River on its head.

63. *Second*, the Final EIS, ROD, and 2027-2028 Guidelines are arbitrary and capricious because they "fail[ ] to consider . . . important aspect[s] of the problem," *Motor Vehicle Mfrs. Ass'n* v. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (*State Farm*), and fail to adequately consider alternatives. *Dep't of Homeland Sec.* v. *Regents of the Univ. of California*, 591 U.S. 1, 30 (2020). On the former, Reclamation failed to properly consider multiple components of the Law of the River—arguably the *most* important factor in management of the Colorado River Basin—in promulgating these actions. It also failed to properly consider the reliability and accuracy of the projections and assumptions on which its conclusions were based, along with the devastating potential consequences to Arizona of its actions. Finally, Reclamation did not adequately address alternatives that would have sought to ensure compliance with the Law of the River, including proposals from the Lower Basin.

64. *Third*, those deficiencies in the Final EIS, ROD, and 2027-2028 Guidelines separately violate NEPA. In issuing the challenged actions, Reclamation failed to consider a "reasonable range of alternatives," 42 U.S.C. § 4332(2)(C)(iii), including alternatives that complied with the Law of the River; failed to consider the foreseeable "effects" of its actions, including on Arizona's communities and industries, *id.* § 4332(2)(C)(i); and did not rely on sufficiently "reliable data and resources." *Id.* § 4332(2)(E). Failure to comply with NEPA's requirements is an independent reason to set aside the Final EIS and ROD and to hold the 2027-2028 Guidelines unlawful. *See*, *e.g.*, *Rock Creek Alliance* v. *U.S. Forest Serv.*, 703 F. Supp. 2d 1152, 1181 (D. Mont. 2010) (setting aside Final Environmental

Impact Statement and Record of Decision issued by federal agency for failure to comply with NEPA).

**A. Reclamation solicits input on a new framework for post-2026 operations, and the States emphasize the importance of compliance with the Law of the River.**

65. Reclamation began the replacement process for the 2007 Guidelines and the Drought Contingency Plans in June 2022. The agency solicited pre-scoping input before formally initiating review under NEPA. *See* 87 Fed. Reg. 37,884 (June 24, 2022).

66. Despite many other points of disagreement, the seven Colorado River Basin States were originally unified on one fundamental point: the seminal importance of the Law of the River. "The Basin States believe the Law of the River, anchored by the 1922 Colorado River Compact and the 1948 Upper Colorado River Basin Compact ('Compacts') together with the 1944 Treaty with Mexico, must be the foundation for the Post-2026 Operations." Ex. G (Seven Basin States Letter to Reclamation (Sep. 1, 2022)) at 3.

67. That message did not change when Reclamation began its formal processes to replace the Guidelines and its accompanying environmental impact statement under NEPA. After Reclamation issued a notice of intent to prepare an environmental impact statement and solicited scoping comments, 88 Fed. Reg. 39,455 (June 16, 2023), the Lower Basin States again maintained that "the Law of the River must be the foundation for the Post-2026 Operations." Ex. C at 2. The Lower Basin States emphasized that the "Post-2026 EIS must analyze whether alternatives are consistent with the 1922 Colorado River Compact non-depletion obligations and delivery obligations to Mexico," and that "[a]lternatives should include actions necessary to ensure compliance with such obligations." *Id.* at 2-3.

68. Reclamation initially acknowledged its Law of the River obligations. In its October 2023 Scoping Report, Reclamation stated its intent "to adopt and implement the guidelines in a manner consistent with the Law of the River," and to use the guidelines, as it had with the 2007 Guidelines, "to implement the [Long-Range Operating Criteria]." Ex. E at 60; *see* 88 Fed. Reg. 72,535 (Oct. 20, 2023).

69. As Reclamation turned to developing frameworks for its new operating guidelines, the Lower Basin States submitted a framework for analysis that respected the 1922 Compact. Ex. H (Lower Basin Alternative (Mar. 6, 2024)). The Lower Basin Alternative started from the perspective

that the Lower Basin had an entitlement to at least 7.5 million acre-feet per year under the Law of the River. It then volunteered reductions in Lower Basin water use of 1.5 million acre-feet per year under most system conditions, including 760,000 acre-feet per year from Arizona alone. *Id.* at 2-3. It proposed operating the reservoirs based on actual hydrology and total system contents, including the water stored in the Upper Initial Units, rather than on forecasts and the elevations of Lake Powell and Lake Mead. *Id.* at 3-4. The Lower Basin asked the Upper Basin to commit to sharing further cuts under the most critical system conditions, when additional reductions beyond 1.5 million acre-feet would be split evenly between the two Basins, up to total reductions of 3.9 million acre-feet. *Id.* at 4. The point was "to minimize risk of noncompliance with the 1922 Compact" by proposing short-term voluntary Lower Basin reductions to the Compact's guarantees. *Ibid.* All told, the Lower Basin Alternative offered a framework that would have resulted in meaningful conservation of water, while remaining faithful to the Compact and the Law of the River.

70. The Lower Basin States weighed in twice more during the alternatives-development phase. In June 2024, responding to a submission from the Upper Basin, the Lower Basin insisted that compliance with the 1922 Colorado River Compact be analyzed in every alternative that Reclamation considered. Ex. I (Lower Basin Letter to Reclamation (June 25, 2024)) at 1. And in December 2024, the Lower Basin supplied specific Compact-compliant assumptions to be incorporated into the Draft EIS's alternatives: required deliveries pursuant to Article III of the Compact, Upper Basin curtailment or other reductions as necessary to comply with the Compact's requirements, and actions by the United States in its management of federal reservoirs to ensure that the Lower Basin receives the water to which it is entitled. *See* Ex. J (Lower Basin Letter to Interior (Feb. 13, 2025)) attach. 1, at 4-5 (describing the June and December 2024 requests).

**B. Reclamation's Draft Environmental Impact Statement rejects the Lower Basin Alternative and fails to properly consider the Law of the River.**

71. These efforts culminated in the Draft EIS, which Reclamation issued in January 2026. *See* 91 Fed. Reg. 2,131 (Jan. 16, 2026) (notice of availability). The Draft EIS effectively ignored the Lower Basin's requests and legal arguments. None of the alternatives carried forward in the Draft EIS adequately considered the Law of the River, much less complied with it. As explained, the Compact

requires the Upper Basin to deliver at least 82.5 million acre-feet of water at Lee Ferry over any ten-year period, *see* ¶¶ 28-35, *supra*, and federal law requires the Secretary to operate the reservoirs on the River to ensure that the Upper Basin's delivery obligation is satisfied, *see* ¶¶ 36-51, *supra*. Yet every alternative assumed that the Upper Basin States would make no meaningful reduction in their own use, no matter how little water the River produced. The alternatives placed the full burden of any resulting shortfall on the Lower Basin.

72. Reclamation's alternatives thus inverted the priority that the Law of the River establishes: They treated cuts to the Lower Basin as the sole solution and the Upper Basin's obligations as non-existent, when the 1922 Compact requires the opposite. *See* ¶¶ 28-35, *supra*. And not one alternative addressed the federal government's obligation to operate the Upper Initial Units—which currently store approximately 4.4 million acre-feet of water (and have the capacity to store nearly seven times that)—to meet the Upper Basin's delivery obligation. Instead, the Draft EIS deemed those reservoirs beyond the geographic scope of the analysis. Ex. K (Arizona Draft EIS Comments (Mar. 2, 2026)) at 3-6. That conclusion has no basis in the Law of the River, which expressly requires operation of the Upper Initial Units to prioritize the Upper Basin's delivery obligations and therefore necessarily brings those reservoirs within the scope of any analysis of management of the Colorado River. *See* ¶¶ 44-45, *supra*.

73. The Draft EIS also excluded the Lower Basin Alternative. By the Draft EIS's own account, the Lower Basin's proposal survived only in the form of "concepts" incorporated into a single federal alternative. Ex. D at ES-8. Reclamation provided no reasonable basis for this exclusion. Nor could it: none of Reclamation's frameworks complied with the Law of the River, yet Reclamation excluded the only framework that *did* properly consider that body of law, and the only framework that adequately accounted for the federal government's obligation to operate the Upper Initial Units in accordance with that law. "At the very least this alternative . . . should have been addressed and adequate reasons given for its abandonment." *State Farm*, 463 U.S. at 48.

74. The Draft EIS was flawed in other respects. *First*, it failed to consider engineering measures at Glen Canyon Dam that could reduce the minimum elevation in Lake Powell required to protect critical infrastructure and thus permit greater releases. *Second*, it failed to consider the severe

economic and national-security consequences of the proposed shortages. *Third*, it failed to acknowledge and protect the United States' trust responsibility to Indian tribes situated in Arizona. *Fourth*, it relied on flawed growth projections of Upper Basin demand as a basis for implementing reductions to Lower Basin water users. And *fifth,* it relied on flawed modeling assumptions, including outdated reservoir elevations and natural flow calculations. *See* Ex. K at 12.

75. Arizona raised each of these objections and many others. *See* Ex. K. Arizona explained that "none of the alternatives" complies with the Law of the River, "in direct violation of federal law and Reclamation's own stated intention to adhere to the Law of the River." *Id.* at 1. It further explained that each of the proposed alternatives "assumes that the Upper Basin states have no duty to comply with their delivery obligations and would make no meaningful reductions in usage and therefore requires the Lower Basin states to accept disproportionate and inequitable reductions," which contravenes the Law of the River. *Id.* at 3. And it pointed out that the Draft EIS was contrary to Section 602(a) of the Colorado River Basin Project Act, which "directs the Secretary to propose coordinated long-range operations" of River reservoirs to comply with the Law of the River. *See* ¶ 48, *supra*; Ex. K at 4. "By artificially limiting the Draft EIS's analysis to the mainstem dams and reservoirs, Reclamation . . . failed to follow congressional direction to coordinate operations among the [Upper Initial Units]." Ex. K at 4.

76. Arizona further criticized the Draft EIS's failure to consider the significant harms caused by imposing additional reductions on the Lower Basin. Arizona explained that the Draft EIS "fails to consider the serious economic and national-security impacts from severely reducing water deliveries to Arizona," including impacts to the semiconductor industry, which the federal government recognizes is critical to the economy and national defense. Ex. K at 1, 6-8. Arizona further explained that the reductions imposed by the Draft EIS would have devastating impacts on Arizona tribes, cities, and towns. *Id.* at 9.

77. Moreover, Arizona pointed out that the Draft EIS's analysis was based on flawed assumptions and models. It explained that the Draft EIS improperly relies on unrealistic and biased projections of Upper Basin growth as a basis for implementing severe reductions to the Lower Basin. Ex. K at 9. Those projections assume substantial future increases in Upper Basin water use, effectively

reserving water for hypothetical future Upper Basin demand. Arizona also explained that the Draft EIS incorporates other flawed modeling assumptions. Specifically, its "reservoir elevations and natural flow calculations are outdated and exclude more recent information," and its Lower Basin depletion schedule "ignores . . . recent historical trends in usage." *Id.* at 12. Finally, Arizona explained that the Draft EIS's approach for modeling the Upper Initial Unit releases was arbitrary and inconsistent, using different parameters across alternatives.

78. On May 1, 2026, recognizing that the River was experiencing one of its driest years on record, the Lower Basin again proposed an operating framework that sought to adapt to the current drought conditions while ensuring Compact compliance as the system recovers. It submitted a proposal for short-term operations through 2028 that offered at least 3.2 million acre-feet of savings by Lower Basin water users—including mandatory reductions of 1.25 million acre-feet per year shared among Arizona, California, and Nevada in 2027 and 2028. Those reductions included 760,000 acre-feet per year from Arizona. The Lower Basin also committed to at least 700,000 acre-feet of additional, voluntary system conservation by water users in the three States. Ex. L (Lower Division States' Proposal for Short-Term Operations (May 1, 2026)) at 2. Consistent with Reclamation's authority over the Upper Initial Units under Section 602(a) of the Colorado River Basin Project Act, *see* ¶ 48, *supra*, the proposal continued to call on Reclamation to release water already stored in those units and "commit to making those releases before making any decisions that reduce annual Lake Powell releases," Ex. L at 4-5.

**C. Reclamation releases a Final Environmental Impact Statement that is contrary to the Law of the River and arbitrary and capricious.**

79. On July 31, 2026, Reclamation issued the first of the agency actions at issue in this suit: the Final EIS. Ex. A; *see* 91 Fed. Reg. 48,385 (July 31, 2026) (notice of availability).

80. The Final EIS considered six "alternatives" or "operational strateg[ies]," Ex. A at ES-3, to "address operations of Lake Powell and Lake Mead through their full operating ranges," *id.* at ES-5. These included: (1) the No Action Alternative, which reverts to annual operating determinations largely based on pre-2007 rules; (2) the Basic Coordination Alternative, under which Lake Powell releases would "primarily be 8.23 [million acre-feet], with some releases above and below 8.23 [million

acre-feet], and minimum releases of 7.0 [million acre-feet]"; (3) the Enhanced Coordination Alternative, in which Lake Powell releases would be determined based on a combination of Lake Powell and Lake Mead elevations, ten-year running average hydrology, and Lower Basin Deliveries; (4) the Maximum Operational Flexibility Alternative, in which Lake Powell releases would range from 5.0 to 11.0 million acre-feet and would be determined by total Colorado River Storage Project system storage and recent hydrology; (5) the Supply Driven Alternative, in which annual Lake Powell releases are determined based on 65% of the 3-year-average natural flow at Lee Ferry; and (6) the Preferred Alternative, described below. *Id.* at ES-11-16.

81. The Final EIS indicates that Reclamation will adopt the "Preferred Alternative." *See* Ex. A at ES-3. As the Final EIS describes it, the Preferred Alternative is a ten-year "decision framework" for operating the Colorado River in years 2027 through 2036. *Id.* at ES-8. The Preferred Alternative does not give water users clarity about what to expect on an annual basis in terms of Reclamation's operation of Lake Powell and Lake Mead, nor does it refrain from constraining those future years. Instead, it establishes "operational principles," "sideboards (key thresholds and ranges for operational elements)," and a process under which the *actual* operating guidelines for the River will be developed and issued in two-year increments, each "adopted through the issuance of a decision document published in the Federal Register." *Ibid.* The operational principles and sideboards will "remain constant through 2036," *ibid.*, and Reclamation will choose which option to select within that framework every two years.

82. Under the Preferred Alternative, the median annual release from Glen Canyon Dam under critically dry hydrology will be only 6.0 million acre-feet. Ex. A at ES-30. And the Preferred Alternative's sideboards allow releases from Lake Powell of as low as 5.0 million acre-feet per year. *Id.* at ES-11. Releases below the Long-Range Operating Criteria's 8.23 million acre-feet minimum, *see* ¶ 51, *supra*, are thus built into the framework as the norm for dry years. Over the framework's ten-year period, the Final EIS projects median flows at Lee Ferry of 80.4 million acre-feet under average hydrology and 73.9 million acre-feet under critically dry hydrology. Ex. A at ES-30. Both figures fall below the minimum 82.5 million acre-feet that Articles III(c) and III(d) of the 1922 Compact require the Upper Basin States to deliver over any ten-year period, *see* ¶¶ 28-35, *supra*.

83. The Preferred Alternative also imposes no mandatory reductions on the Upper Basin. Indeed, the Final EIS generally contemplates only "[v]oluntary Upper Basin contributions up to [200,000 acre-feet] per year subject to hydrologic conditions." Ex. A at ES-10. Yet the Preferred Alternative *requires* the Lower Basin States to shoulder reductions of as much as 3.0 million acre-feet under certain conditions. In short, the Upper Basin's contribution is voluntary, contingent on hydrology, and in any event capped at 200,000 acre-feet per year—a fraction of the shortages the Lower Basin States are asked to bear.

84. Lastly, the Final EIS excludes from its analysis any activities above Lake Powell, on the ground that operations at the Upper Initial Units will "remain within the scope of the existing RODs." Ex. A at ES-6 & n.4. And under the Preferred Alternative, the prospect of using water already stored in the Upper Initial Units is left merely "potential." *Id.* at ES-10.

85. The Final EIS is contrary to the Law of the River, it violates NEPA, and it is arbitrary and capricious.

86. *First*, the operational principles and sideboards do not comply with the Law of the River. The Final EIS barely mentions the Law of the River or the 1922 Compact and nowhere analyzes whether the Preferred Alternative's release ranges and shortage volumes comply with it. In fact, the Preferred Alternative expressly contemplates that Reclamation will depart from the 1922 Compact by prescribing releases far below the minimum objective established by the Long-Range Operating Criteria and the amount required to satisfy the 1922 Compact's delivery obligation. *See* Ex. A at ES-9 (recognizing that operating guidelines "may . . . provide for temporary operational actions that are not otherwise provided for under the [Long-Range Operating Criteria]"). And by treating releases from the Upper Initial Units as merely optional, the Final EIS disregards Section 602(a) of the Colorado River Basin Project Act, which requires the Secretary to operate Upper Basin reservoirs to prioritize the delivery obligation.

87. *Second*, the Final EIS is arbitrary and capricious. Far from adhering to the 1922 Compact and the Law of the River, the Final EIS refuses to even take a position on what federal law requires and thus consciously fails to consider an important aspect of the problem. The Final EIS also neglects other important aspects of the problem, including the consequences of the alternatives on

Arizona's economy and communities and the flaws in its underlying data and models. *See* Ex. A at R-43 (admitting that Reclamation declined to "adopt[ ] sector-specific production or employment forecasts"); *id.* at R-5 (admitting that projections for Upper Basin demand "represent anticipated demand under *ideal* hydrologic and economic conditions and *are not supply-limited*") (emphasis added). And the Final EIS fails to consider a reasonable range of alternatives, most notably the Lower Basin Proposal that complied with the Law of the River and called for consideration of engineering measures at Glen Canyon Dam.

88. *Third*, the Final EIS violates NEPA for similar reasons. As explained, the Final EIS failed to consider a reasonable range of alternatives and neglected to consider important effects of its proposed alternatives. *See* ¶ 64, *supra*. Reclamation's analysis also rested on unreliable data and resources, including outdated projections of usage in the Basin. Arizona articulated each of those objections in a comment letter on the Draft EIS, but Reclamation failed to adequately respond to or account for Arizona's concerns.

**D. The Record of Decision adopts the flawed Preferred Alternative, and the 2027-2028 Guidelines apply it.**

89. Arizona expressed its objections to the Final EIS in an August 2026 letter, which reiterated many of the same points from the State's response to the Draft EIS. *See* Ex. M (Arizona Final EIS Comments (Aug. 10, 2026)) at 1-4. Arizona explained that the Preferred Alternative is inconsistent with the Compact and the Law of the River, and it warned the Department that the Final EIS does not satisfy the Department's NEPA and APA obligations because it fails to adequately address the issues Arizona raised in response to the Draft EIS. *Ibid.*

90. But on August 21, 2026, the Department issued its Record of Decision, which repeated the errors of the Final EIS. *See* ECF No. 1-3 (ROD (Aug. 2026)). As the Final EIS previewed, the ROD adopts the ten-year "Preferred Alternative" decision framework described above, including its flawed operational principles and sideboards, as the governing structure for the operation of Lake Powell and Lake Mead through 2036.

91. Pursuant to the ROD, the Department simultaneously issued operating guidelines for 2027 and 2028. ECF No. 1-4 (2027-2028 Guidelines (Aug. 2026)). The 2027-2028 Guidelines apply

the Preferred Alternative to establish the criteria that govern the coordinated operation of Lake Powell and Lake Mead for the next two years.

92. The operating criteria for Lake Powell "are designed to protect a minimum Lake Powell elevation of 3,500 feet by initially seeking to maintain a minimum elevation of 3,510 feet." ECF No. 1-4 § 5.1. Annual releases from Lake Powell are thus determined by the reservoir's projected elevation. *Ibid.* In water years where Lake Powell's projected October 1 elevation is at or above 3,565 feet, Reclamation uses 8.23 million acre-feet as a starting point that can be adjusted downward to as low as 6.0 million acre-feet if the reservoir's projected elevation drops below 3,510 feet. *Id.* § 5.1(A). In "extraordinary circumstances"—where Lake Powell is projected to reach elevations below 3,500 feet—the 2027-2028 Guidelines contemplate releases as low as 5.0 million acre-feet. *Id.* § 5.1(D). And in water years where the projected October 1 elevation is less than 3,565 feet, a Compact-compliant release meeting the Long-Range Operating Criteria's objective of 8.23 million acre-feet is not even considered. *Id.* § 5.1(B)-(C).

93. The operating criteria for Lake Mead lock in reductions of 1.25 million acre-feet to the Lower Basin in both 2027 and 2028. ECF No. 1-4 § 5.3(A). If the Lower Basin States agree, the 2027-2028 Guidelines provide that Reclamation will distribute 760,000 acre-feet of reductions per year to Arizona, 440,000 to California, and 50,000 to Nevada. *Id.* § 5.3(A)(2). Absent such an agreement, the Secretary will apportion reductions "in accordance with applicable law." *Id.* § 5.3(A)(3). In addition to those reductions, the 2027-2028 Guidelines expect Lower Basin contractors to conserve an additional 700,000 acre-feet of water from 2026 to 2028. *Id.* § 5.3(B).

94. Like each action that preceded them, the 2027-2028 Guidelines depart from the Law of the River and fail to address Arizona's well-documented concerns. For example, conspicuously absent from the 2027-2028 Guidelines is *any mention* of the 1922 Compact. And while the 2027-2028 Guidelines acknowledge the Long-Range Operating Criteria's objective "to maintain a minimum release of water from Lake Powell" of 8.23 million acre-feet, they declare it out of reach and assert, without any legal basis, the authority to take "temporary operational actions that are not otherwise provided for under the [Long-Range Operating Criteria]." ECF No. 1-4 §§ 1, 5. Accordingly, the Guidelines provide for annual releases from Lake Powell that, in all but the most favorable reservoir

conditions, fall well short of the Long-Range Operating Criteria's 8.23-million-acre-foot objective.

95. To be sure, the 2027-2028 Guidelines would accommodate reduction and conservation volumes as set forth in the Lower Basin's May 2026 proposal. *See* ¶ 78, *supra*. But the Lower Basin volunteered those reductions and contributions as part of an "integrated, non-severable package" that was "directly dependent" on additional requested operations related to Lake Powell releases and the Upper Initial Units. Ex. L at 1. Those additional operations—which included releasing water from the Upper Initial Units to satisfy the Upper Basin's Compact obligations—were uniformly ignored in the Final EIS, ROD, and the Guidelines. The Guidelines therefore adopt the Lower Basin's proposed reductions while discarding the requirements on which they were conditioned.

96. The 2027-2028 Guidelines inherited the problems introduced by the Final EIS and adopted in the ROD. *See* ¶¶ 85-90, *supra*. They are the product of a flawed analysis that, among other things, never assessed compliance with the Compact's delivery obligation, failed to properly account for use of the Upper Initial Units to meet that obligation, and never considered engineering measures at Glen Canyon Dam that would restore access to the storage stranded below the 3,500-foot protection elevation. *See* ¶¶ 86-88, *supra*.

**E. The Final EIS, ROD, and 2027-2028 Guidelines will cause substantial, irreparable harm to Arizona.**

97. The Final EIS, ROD, and 2027-2028 Guidelines will have devastating and irreversible consequences for Arizona—consequences that are traceable to the federal government's failure to abide by the Law of the River in promulgating the challenged actions.

98. Under the decree in *Arizona* v. *California*, 376 U.S. 340 (1964), Arizona is entitled to 2.8 million acre-feet of Colorado River water each year. *Id.* at 342. Of the remainder of the 7.5 million acre-feet allocated to the Lower Basin, 4.4 million acre-feet is apportioned to California and 300,000 acre-feet is apportioned to Nevada. *Id.* Arizona and California split any water in excess of 7.5 million acre-feet. *Ibid.*; *see* Consolidated Decree, *Arizona* v. *California*, 547 U.S. 150, 155 (2006).

99. Those 2.8 million acre-feet, along with additional water that Arizona uses from the River when available, are the lifeblood of the State. Water from the Colorado River provides

approximately 36% of Arizona's total water supply.[4] Many communities along the River's mainstem, including numerous Indian tribes, draw their supplies from the River itself or from wells in the River's aquifer.[5] Those communities rely almost exclusively on Colorado River water to meet their basic needs, and many have no alternative supply. Ex. K at 8.

100. Arizona's cities, farms, and industries alike depend on the River's continued flow for their survival. The cuts the ROD authorizes would fall on Arizona communities already suffering from years of diminished deliveries—consequences about which Arizona warned the federal government repeatedly. *See* Ex. K at 6-9; Ex. M at 3-4.

101. The threatened reductions would place enormous strain on Arizona's municipal water supplies. Phoenix, for example, supplies water to more than 1.5 million residents and currently obtains approximately 40% of that drinking water from the Colorado River.[6] Severe reductions would threaten the long-term water supply on which its residents, businesses, hospitals, schools, and other essential services depend.[7]

102. Likewise, as deliveries of Colorado River water have fallen short in recent years, Arizona farmers have been unable to regularly provide water to their lands and have suffered lower crop production and even crop failures.[8] Arizona farmers have been forced to leave hundreds of thousands of acres of irrigated farmland unplanted because there is no water to sustain the crops.[9]

103. Under Reclamation's new operational frameworks, those losses will compound. The agency's own modeling of post-2026 conditions projects nearly 160,000 additional fallowed acres of Arizona farmland in a maximum-shortage year, with annual crop losses in the hundreds of millions of

---

[4] Arizona Department of Water Resources, *Water Your Facts*, tinyurl.com/39a53vbx.

[5] Bureau of Reclamation, *Colorado River Accounting and Water Use Report: Arizona, California, and Nevada, Calendar Year 2024*, at 12-19 (May 15, 2025), tinyurl.com/ypeh7uyv.

[6] City of Phoenix, *Comments of the City of Phoenix on the Bureau of Reclamation's Draft Environmental Impact Statement* 6 (Mar. 1, 2026), tinyurl.com/2yjv5wnc.

[7] *Id.* at 6-11.

[8] Clara Migoya, *With Colorado River Water Cuts, Some Pinal Farmers Drill Wells. For Others, Fields Sit Dry*, Ariz. Republic (Feb. 8, 2023), tinyurl.com/47hxwrm2.

[9] *See ibid.*; *see also* Ariz. State Univ., Arizona Water Innovation Initiative, *Impacts of Colorado River Water Shortages on Agriculture in Central Arizona*, tinyurl.com/4xbbka47.

dollars. Ex. A at ES-57-61.

104. The resulting decline in Arizona's agricultural production will have national consequences. Most of the Nation's winter leafy greens come from Arizona and California counties along the Colorado River, with the Yuma region alone supplying roughly 90% of that crop.[10] Arizona plays a vital role in the Nation's production of many other crops, too, including spinach, broccoli, cauliflower, cantaloupe, and honeydew.[11]

105. The contemplated shortages also pose a threat to the Nation's security. Since 2020, Arizona has led the Nation in new investment in semiconductors, which the federal government has declared "integral to America's economic and national security."[12] And Arizona's major semiconductor-fabrication plants sit in communities that depend heavily on Colorado River water.[13] One of the Nation's largest defense contractors uses Colorado River water for its manufacturing activity in Tucson.[14] And Arizona businesses that produce 70% of the Nation's refined copper depend on reliable Colorado River water.[15] Curtailing those operations would threaten not only thousands of Arizona jobs, but also a copper supply critical to infrastructure, advanced manufacturing, and national defense.[16]

106. These shortages will force Arizona's cities and farms to rely more heavily on groundwater pumping, which could have catastrophic environmental consequences. When groundwater is used faster than it can be replenished, the underground aquifers compact and the land

---

[10] *See* Dep't of Agric. & Res. Econ., Univ. of Ariz., *Arizona Leafy Greens: Economic Contributions of the Industry Cluster* 11, tinyurl.com/2hadtpy5; Yuma, Arizona, *Agriculture*, tinyurl.com/6wd66w46.

[11] Ariz. Dep't of Agric., *Arizona Specialty Crop Guide* (2019), tinyurl.com/2svsf96n.

[12] Ariz. Commerce Auth., *TSMC Announces Additional $100 Billion Investment in Arizona* (July 16, 2026), tinyurl.com/24myfurf; Nat'l Inst. of Standards & Tech., *CHIPS for America*, tinyurl.com/4srezp3p.

[13] *See* Nat'l Inst. of Standards & Tech., *Fact Sheet: Arizona Semiconductor Industry* 1 (July 2024), tinyurl.com/43m2hxh9; City of Phoenix, *Phoenix Water Services Drought Management*, tinyurl.com/2nc4b285.

[14] Howard Fischer, *Gov. Hobbs Makes Pitch for Arizona's Share of Colorado River Water*, Ariz. Daily Star (Mar. 17, 2026), tinyurl.com/3apb4wm8 (discussing Raytheon manufacturing in Tucson).

[15] Freeport-McMoRan, *Comments on Draft Environmental Impact Statement for Near-Term Colorado River Operations* 1 (Mar. 2, 2026), tinyurl.com/mwdrhm3y.

[16] *Ibid.*

above them sinks.[17] This process—known as subsidence—can permanently destroy the aquifers' ability to store water, open fissures on the surface of the land, and contaminate the remaining groundwater.[18] In Arizona, subsidence has already produced 167 miles of mapped earth fissures and damaged more than 3,400 square miles of land.[19] Arizona has made substantial progress to curtail the devastating effects of groundwater overdraft, but that progress could be erased if the contemplated shortages take effect. In 1980, Arizona adopted legislation requiring several of Arizona's urban areas to diminish reliance on groundwater and reduce groundwater withdrawal below replenishment.[20] That law is working. Land subsidence in those areas has slowed by as much as 90% since the 1990s.[21] But continued progress depends on Arizona's access to alternative water sources, including from the Colorado River.

**F. Nevada sues to vacate the Final EIS, ROD, and 2027-2028 Guidelines.**

107. On August 24, 2026, the State of Nevada, the Colorado River Commission of Nevada, and the Southern Nevada Water Authority (collectively, Nevada) filed a complaint challenging the Final EIS, ROD, and 2027-2028 Guidelines. ECF No. 1. Nevada alleges that all three actions violate the APA because they are contrary to the Law of the River and NEPA, and are arbitrary and capricious. *Ibid.* Nevada accordingly asks this Court to vacate each action and enjoin its implementation. *Id.* at 2, 28.

108. Although Arizona agrees that the Final EIS, ROD, and Guidelines violate the Law of the River, it does not agree with every allegation in Nevada's complaint. For example, Nevada contends that the Final EIS's Shortage Allocation Model unlawfully fails to treat the Lower Basin States' apportioned shortages as "co-equal," and that its priority-based distribution of cuts violates Section 301(b) of the Colorado River Basin Project Act. ECF No. 1 ¶ 80. Arizona disagrees. Section 301(b) does not cap Nevada's share of any shortage at a fixed percentage. Nothing in this Complaint

---

[17] *See* Ariz. Dep't of Water Res., *State-of-Art Technology at Work on Arizona Subsidence Finds You're Not Imagining It* (July 27, 2017), tinyurl.com/2np27kep (*ADWR Subsidence Article*).

[18] *See ibid.*; Ariz. Geological Survey, *Earth Fissures & Subsidence*, tinyurl.com/343sb6dp.

[19] *See ADWR Subsidence Article*.

[20] *See* Ariz. Rev. Stat. § 45-401 *et seq.*

[21] *See ADWR Subsidence Article*.

Gibson, Dunn & Crutcher LLP

in Intervention should be construed as adopting Nevada's characterization of the priorities governing the allocation of shortages among the Lower Basin States.

109. Arizona also requests different relief than Nevada, in part. Nevada requests vacatur of the 2027-2028 Guidelines, ECF No. 1 at 28, but Arizona does not. Those Guidelines suffer from the same fatal deficiencies as the Final EIS and the ROD. But if vacated, Arizona and other Colorado River Basin water users will have no guidance on how Reclamation plans to administer the reservoirs along the River for the next two years. Without such guidance, Arizona cannot properly plan for the future, including for any shortages that will result from the Upper Basin's failure to comply with the 1922 Compact.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C): The Final EIS Is Contrary to the Law of the River

110. Arizona repeats, realleges, and incorporates the allegations in the paragraphs above as though fully set forth herein.

111. The Final EIS constitutes "final agency action for which there is no other adequate remedy." 5 U.S.C. § 704. Agency action is final if (1) it marks the "consummation" of the agency's decision-making process and is not "merely tentative or interlocutory," and (2) "rights or obligations have been determined" or "legal consequences will flow" from the action. *Bennett* v. *Spear*, 520 U.S. 154, 177-178 (1997) (citations omitted). "There is no doubt" that a party may challenge a final EIS as final agency action. *Oregon Natural Desert Ass'n* v. *Bureau of Land Mgmt.*, 625 F.3d 1092, 1118 (9th Cir. 2010). The Final EIS consummates Reclamation's decision-making process and determines legal rights and obligations by establishing a limited menu of operational frameworks to govern reservoir operations through 2036 and constraining Reclamation's ability to adopt other frameworks.

112. Reviewing courts shall hold unlawful agency decisions found to be "not in accordance with law," 5 U.S.C. § 706(2)(A), or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C). An agency action that "violates [a statute] is 'not in accordance with law' within the meaning of 5 U.S.C. § 706(2)(A)." *Chrysler Corp.* v. *Brown*, 441 U.S. 281, 318 (1979).

113. The Final EIS is not in accordance with law and is in excess of statutory authority because it authorizes operations that violate the Colorado River Compact and the federal statutes and operating criteria that require compliance with it.

114. Congress has repeatedly required the federal government to operate the Colorado River system in conformity with the 1922 Compact and the broader Law of the River. The Colorado River Storage Project Act directs the government, in operating and maintaining federal reservoirs, to comply with the 1922 Compact and the Mexican Water Treaty. 43 U.S.C. § 620m. The Colorado River Basin Project Act likewise directs all federal officers and agencies operating facilities in the Colorado River system to comply with the 1922 Compact and Treaty. *Id.* § 1551(c). Section 602(a) of that Act further prescribes the order in which water must be stored and released from the federal reservoir system: first, releases necessary to satisfy the Upper Basin's contributions to Mexico under Article III(c) of the 1922 Compact; second, releases necessary to comply with the Upper Basin's delivery obligation to the Lower Basin under Article III(d); and only then, storage of water not required for those releases. *Id.* § 1552(a). And the Long-Range Operating Criteria implement those statutory commands by targeting, among other things, an annual release from Lake Powell of at least 8.23 million acre-feet.

115. The Final EIS departs from those requirements. Indeed, the Final EIS barely mentions the Law of the River or the 1922 Compact. It states Reclamation's intent "to adopt and implement the guidelines in a manner consistent with the Law of the River." Ex. A at ES-6. But it nowhere construes the Law of the River, and it nowhere analyzes whether the Preferred Alternative's release ranges and shortage volumes comply with it. Instead, it constrains Reclamation to a menu of operational frameworks, none of which ensures compliance with the Law of the River. In response to Arizona's comment that none of the proposed alternatives complies with the Law of the River, Reclamation stated only that it is "not interpreting the legal meaning of the 1922 Colorado River Compact or resolving differing interpretations" and that it "will follow all relevant provisions of federal law." *Id.* at R-4. But Reclamation's projections contemplate violations of the Law of the River. Reclamation's refusal to interpret the Compact is a clear indication that it is at best indifferent toward its obligation to comply with the Compact. The agency never offered any explanation for how that indifference can be squared with its statutory mandate.

Gibson, Dunn & Crutcher LLP

116. Worse, the Final EIS indicates an intent to adopt the Preferred Alternative, which expressly contemplates that Reclamation will depart from the 1922 Compact. The Preferred Alternative authorizes Lake Powell releases far below the minimum required by the Long-Range Operating Criteria and the amount required to satisfy the 1922 Compact's delivery obligation. *See* Ex. A at ES-9 (recognizing that operating guidelines "may . . . provide for temporary operational actions that are not otherwise provided for under the [Long-Range Operating Criteria]"); *supra*, ¶¶ 81-82. And it imposes no mandatory reductions and assumes no curtailment in the Upper Basin, even though the 1922 Compact and the 1948 Compact require the Upper Basin to curtail its own use to satisfy its delivery obligation to the Lower Basin. *See supra*, ¶¶ 30-31, 41-42.

117. The Final EIS further violates the Colorado River Basin Project Act by excluding the Upper Initial Units from the scope of its analysis. Section 602(a) *requires* the Secretary to operate the Upper Basin's reservoirs first to satisfy the Mexican Treaty burden, then to comply with Article III(d)'s delivery obligation, and only after those first two priorities have been satisfied, to store water for Upper Basin use. 43 U.S.C. § 1552(a)(1)-(3); *see* ¶ 48, *supra*. By merely "potential[ly]" using the Upper Initial Units while prescribing firm reductions for the Lower Basin, the Preferred Alternative fails to comply with that statutory requirement. *See* Ex. A at ES-9-10.

118. Arizona has been and will continue to be injured by the Final EIS.

**COUNT II**
**Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A):**
**The Final EIS Is Arbitrary and Capricious**

119. Arizona repeats, realleges, and incorporates the allegations in the paragraphs above as though fully set forth herein.

120. Reviewing courts shall hold unlawful agency actions "found to be . . . arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

121. The Final EIS is arbitrary and capricious because Reclamation "failed to consider . . . important aspect[s] of the problem" before it, *State Farm*, 463 U.S. at 43; failed to adequately consider reasonable alternatives to its proposals, *see Regents*, 591 U.S. at 30; and failed generally to consider important disadvantages of its decisions, *see Michigan* v. *EPA*, 576 U.S. 743, 753 (2015) ("[R]easonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages

Gibson, Dunn & Crutcher LLP

of agency decisions.”).

122. Specifically, Reclamation:

- failed to adequately consider the Law of the River and the agency’s obligations under it;
- failed to offer a technical or legal justification for adopting a ten-year decision framework;
- failed to consider the severe environmental, economic, and national-security harms to Arizona resulting from the shortages and reduced releases authorized by the Final EIS;
- failed to analyze engineering measures at Glen Canyon Dam that could reduce the minimum elevation in Lake Powell required to protect critical infrastructure;
- relied on outdated Upper Basin demand projections and depletion-schedule assumptions; and
- failed to give due consideration to alternatives, including the Lower Basin’s proposals, even though those proposals were the only ones that properly considered compliance with the Law of the River.

123. Arizona has been and will continue to be injured by the Final EIS.

**COUNT III**
**Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (D):**
**The Final EIS Fails to Comply with NEPA**

124. Arizona repeats, realleges, and incorporates the allegations in the paragraphs above as though fully set forth herein.

125. NEPA “‘prescribes the necessary process’ for an agency’s environmental review of a project.” *Seven Cnty. Infrastructure Coal.* v. *Eagle Cnty.*, 605 U.S. 168, 177 (2025) (citation omitted). It requires that an environmental impact statement analyze a “reasonable range of alternatives” to a proposed agency action that “meet the purpose and need of the proposal,” 42 U.S.C. § 4332(2)(C)(iii); consider the “reasonably foreseeable environmental effects” of the action, *id.* § 4332(2)(C)(i); and use “reliable data and resources,” *id.* § 4332(2)(E).

126. “Challenges to an agency’s compliance with NEPA are reviewed under standards set forth in the [APA].” *Se. Alaska Conservation Council* v. *Fed. Highway Admin.*, 649 F.3d 1050, 1056

(9th Cir. 2011). An agency action that violates NEPA may be set aside as having been undertaken "without observance of procedure required by law," *Ctr. for Biological Diversity* v. *U.S. Forest Serv.*, 349 F.3d 1157, 1165 (9th Cir. 2003) (quoting 5 U.S.C. § 706(2)(D)), or as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *Oregon Nat. Desert Ass'n* v. *Jewell*, 840 F.3d 562, 568 (9th Cir. 2016) (quoting 5 U.S.C. § 706(2)(A)).

127. The Final EIS violates NEPA's requirements. The Final EIS failed to consider a reasonable range of alternatives, including the Lower Basin's "viable" and "reasonable" alternative proposal and any alternative that ensured compliance with the Law of the River. *Se. Alaska Conservation Council*, 649 F.3d at 1056 ("We have repeatedly recognized that if the agency fails to consider a viable or reasonable alternative, the EIS is inadequate."). The Final EIS also failed adequately to consider the effects on Arizona's communities and industries, including its agricultural and semiconductor industries. And the Final EIS relied on unreliable data and models.

128. Arizona has been and will continue to be injured by the Final EIS.

**COUNT IV**
**Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C):**
**The Record of Decision Is Contrary to the Law of the River**

129. Arizona repeats, realleges, and incorporates the allegations in the paragraphs above as though fully set forth herein.

130. The ROD constitutes "final agency action for which there is no other adequate remedy." 5 U.S.C. § 704. It consummates Reclamation's decision-making process and determines legal rights and obligations by establishing the operational framework that will govern reservoir operations through 2036. *See Bennett*, 520 U.S. at 177-178. It is well established that a Record of Decision constitutes final agency action. *See Oregon Natural Desert Ass'n*, 625 F.3d at 1118.

131. Reviewing courts shall hold unlawful agency decisions found to be "not in accordance with law," 5 U.S.C. § 706(2)(A), or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C). An agency action that "violates [a statute] is 'not in accordance with law' within the meaning of 5 U.S.C. § 706(2)(A)." *Chrysler Corp.*, 441 U.S. at 318.

132. The ROD is not in accordance with law and is in excess of statutory authority because it authorizes operations that violate the Colorado River Compact and the federal statutes and operating

criteria that require compliance with it.

133. Congress has repeatedly required the federal government to operate the Colorado River system in conformity with the Compact and the broader Law of the River. *See* ¶ 114, *supra*.

134. As explained above with respect to the Final EIS, the ROD departs from those requirements. It authorizes operations under which Lake Powell releases may fall below 8.23 million acre-feet, permits Lower Basin shortages without first requiring releases from the Upper Initial Units as Congress prescribed, and adopts a framework that permits flows at Lee Ferry below the amounts required by the 1922 Compact.

135. The ROD therefore conflicts with the Colorado River Compact, the Boulder Canyon Project Act, the Colorado River Storage Project Act, the Colorado River Basin Project Act, and the Long-Range Operating Criteria, and is contrary to law.

136. Arizona has been and will continue to be injured by the ROD.

**COUNT V**
**Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A):**
**The Record of Decision Is Arbitrary and Capricious**

137. Arizona repeats, realleges, and incorporates the allegations in the paragraphs above as though fully set forth herein.

138. Reviewing courts shall hold unlawful agency actions "found to be . . . arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

139. The ROD is arbitrary and capricious for the same reasons as the Final EIS.

140. The Record of Decision is arbitrary and capricious because Reclamation "failed to consider . . . important aspect[s] of the problem" before it, *State Farm*, 463 U.S. at 43; failed to adequately consider reasonable alternatives to its proposals, including the Lower Basin's proposed alternative, even though that alternative sought to ensure compliance with the Law of the River, *see Regents*, 591 U.S. at 30; and failed generally to consider important disadvantages of its decisions, *see Michigan*, 576 U.S. at 753.

141. Arizona has been and will continue to be injured by the ROD.

**COUNT VI**
**Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (D):**
**The Record of Decision Fails to Comply with NEPA**

142. Arizona repeats, realleges, and incorporates the allegations in the paragraphs above as though fully set forth herein.

143. NEPA requires that an environmental impact statement: analyze a "reasonable range of alternatives" to a proposed agency action that "meet the purpose and need of the proposal," 42 U.S.C. § 4332(2)(C)(iii); consider the "reasonably foreseeable environmental effects" of the action, *id.* § 4332(2)(C)(i); and use "reliable data and resources," *id.* § 4332(2)(E).

144. When Reclamation prepares an environmental impact statement, it must "document a decision" in a "record of decision" that identifies the alternatives the agency considered and the reasons for its decision. DOI NEPA Handbook §§ 4.1(a)(1), 6.1(x).

145. The ROD, which states Reclamation's chosen alternative from among those in the Final EIS, *see* DOI NEPA Handbook §§ 4.1(a)(1), 6.1(x), violates NEPA for the same reasons as the Final EIS and so should be set aside. *See*, *e.g.*, *Great Basin Res. Watch* v. *Bureau of Land Mgmt.*, 844 F.3d 1095, 1111-1112 (9th Cir. 2016) (remanding with instructions to vacate Record of Decision because EIS did not comply with NEPA).

146. Arizona has been and will continue to be injured by the ROD.

**COUNT VII**
**Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C):**
**The 2027-2028 Guidelines Are Contrary to the Law of the River**

147. Arizona repeats, realleges, and incorporates the allegations in the paragraphs above as though fully set forth herein.

148. The 2027-2028 Guidelines constitute "final agency action for which there is no other adequate remedy." 5 U.S.C. § 704. The Guidelines expressly state that they are a "final agency action." ECF No. 1-4 § 1. They consummate Reclamation's decision-making process with respect to the framework governing operation of the reservoirs from 2027 to 2028 and establish legal rights and obligations respecting operations for the next two years. *See Bennett*, 520 U.S. at 177-178.

149. Reviewing courts shall hold unlawful agency decisions found to be "not in accordance with law," 5 U.S.C. § 706(2)(A), or "in excess of statutory jurisdiction, authority, or limitations, or

Gibson, Dunn & Crutcher LLP

short of statutory right," *id.* § 706(2)(C). An agency action that "violates [a statute] is 'not in accordance with law' within the meaning of 5 U.S.C. § 706(2)(A)." *Chrysler Corp.*, 441 U.S. at 318.

150. The Guidelines are not in accordance with law and are in excess of statutory authority because they authorize operations that violate the 1922 Compact and the federal statutes and operating criteria that require compliance with it, for the same reasons as the ROD.

151. Arizona has been and will continue to be injured by the Guidelines.

152. A flawed agency action need not be vacated. *Cal. Cmtys. Against Toxics*, 688 F.3d at 992. "Whether agency action should be vacated depends on how serious the agency's errors are and the disruptive consequences of an interim change that may itself be changed." *Ibid.* (citation and internal quotation marks omitted). Because the disruptive consequences of vacatur would be catastrophic for Arizona, Arizona requests that the Guidelines be remanded without vacatur. *See* ¶¶ 97-106, 109, *supra*.

**COUNT VIII**
**Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A):**
**The 2027-2028 Guidelines Are Arbitrary and Capricious**

153. Arizona repeats, realleges, and incorporates the allegations in the paragraphs above as though fully set forth herein.

154. The 2027-2028 Guidelines are arbitrary and capricious for the same reasons as the ROD.

155. Arizona has been and will continue to be injured by the Guidelines.

156. A flawed agency action need not be vacated. *Cal. Cmtys. Against Toxics*, 688 F.3d at 992. "Whether agency action should be vacated depends on how serious the agency's errors are and the disruptive consequences of an interim change that may itself be changed." *Ibid.* (citation and internal quotation marks omitted). Because the disruptive consequences of vacatur would be catastrophic for Arizona, Arizona requests that the Guidelines be remanded without vacatur. *See* ¶¶ 97-106, 109, *supra*.

**COUNT IX**
**Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (D):**
**The 2027-2028 Guidelines Fail to Comply with NEPA**

157. Arizona repeats, realleges, and incorporates the allegations in the paragraphs above as

though fully set forth herein.

158. NEPA requires that an environmental impact statement analyze a "reasonable range of alternatives" to a proposed agency action that "meet the purpose and need of the proposal," 42 U.S.C. § 4332(2)(C)(iii); consider the "reasonably foreseeable environmental effects" of the action, *id.* § 4332(2)(C)(i); and use "reliable data and resources," *id.* § 4332(2)(E).

159. The Final EIS and ROD violate NEPA for the reasons stated above. *See* ¶¶ 125-127, 143-145, *supra*. The 2027-2028 Guidelines are unlawful under NEPA because they were based on the flawed Final EIS and ROD. *See Sierra Club* v. *U.S. Dep't of Transp.*, 1995 WL 110394, at *4 (N.D. Cal. Mar. 6, 1995) (noting that "[g]enerally when a court finds an EIS invalid, it sets aside any action based on that EIS").

160. Arizona has been and will continue to be injured by the 2027-2028 Guidelines.

161. A flawed agency action need not be vacated. *Cal. Cmtys. Against Toxics*, 688 F.3d at 992. "Whether agency action should be vacated depends on how serious the agency's errors are and the disruptive consequences of an interim change that may itself be changed." *Ibid.* (citation and internal quotation marks omitted). Because the disruptive consequences of vacatur would be catastrophic for Arizona, Arizona requests that the 2027-2028 Guidelines be remanded without vacatur. *See* ¶¶ 97-106, 109, *supra*.

## PRAYER FOR RELIEF

For these reasons, Arizona respectfully requests that this Court enter judgment in its favor and against Defendants as follows:

(i) A declaratory judgment that the Final EIS, ROD, and 2027-2028 Guidelines are arbitrary, capricious, or otherwise not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A); in excess of statutory jurisdiction, authority, or limitations, or short of statutory right within the meaning of 5 U.S.C. § 706(2)(C); and without observance of procedure required by law within the meaning of 5 U.S.C. § 706(2)(D);

(ii) An order vacating and setting aside the Final EIS and Record of Decision in their entirety pursuant to the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C), (D);

(iii) An order remanding without vacating the 2027-2028 Guidelines for reconsideration in

light of the judgment in this case;

(iv) An order enjoining Defendants and their officers, employees, and agents from enforcing, implementing, applying, or taking any action whatsoever under the Final EIS and ROD after 2028; and

(v) Any other relief as the Court deems just and equitable.

DATED: October 16, 2026

Respectfully Submitted,

*/s/ Joseph C. Reynolds*

Mark A. Hutchison (Bar No. 4639)
Hutchison & Steffen, PLLC
10080 W. Alta Drive, Suite 200
Las Vegas, Nevada 89145
(702) 385-2500
mhutchison@hutchlegal.com

Joseph C. Reynolds (Bar No. 8630)
Hutchison & Steffen, PLLC
100 W. Liberty Street, Suite 765
Reno, Nevada 89501
(775) 853-8746
jreynolds@hutchlegal.com

Nicole D. Klobas
[*Pro Hac Vice Motion Forthcoming*]
Arizona Department of Water Resources
1110 West Washington Street, Suite 310
Phoenix, Arizona 85007
(602) 771-8477
ndklobas@azwater.gov

Jeffrey B. Wall
[*Pro Hac Vice Motion Forthcoming*]
Morgan R. Ratner
[*Pro Hac Vice Motion Forthcoming*]
Gibson, Dunn & Crutcher LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500
jwall@gibsondunn.com
mratner@gibsondunn.com

Yaira Dubin
[*Pro Hac Vice Motion Forthcoming*]
Parisa Sadeghi
[*Pro Hac Vice Motion Forthcoming*]
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, New York 10166
(212) 351-4000
ydubin@gibsondunn.com
psadeghi@gibsondunn.com

Gregg J. Costa
[*Pro Hac Vice Motion Forthcoming*]
Gibson, Dunn & Crutcher LLP
811 Main Street, Suite 3000
Houston, Texas 77002
(346) 718-6600
gcosta@gibsondunn.com

Stephen J. Hammer
[*Pro Hac Vice Motion Forthcoming*]
Gibson, Dunn & Crutcher LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201
(214) 698-3100
shammer@gibsondunn.com

*Attorneys for Plaintiff-Intervenor*

## INDEX OF EXHIBITS

| Exhibit | Description |
|---|---|
| A | Final Environmental Impact Statement, Post-2026 Operational Guidelines and Strategies for Lake Powell and Lake Mead (July 2026) (Executive Summary and Excerpt of Appendix R) |
| B | Post-2026 Colorado River Reservoir Operations Alternatives Report (Jan. 2025) (Excerpt) |
| C | Letter from the Governors' Representatives of Arizona, California, and Nevada to Commissioner Touton (Aug. 15, 2023) |
| D | Draft Environmental Impact Statement, Post-2026 Operational Guidelines and Strategies for Lake Powell and Lake Mead (Jan. 2026) (Executive Summary) |
| E | Scoping Report for Post-2026 Colorado River Reservoir Operations (Oct. 2023) (Excerpt) |
| F | Record of Decision, Supplement to the 2007 Colorado River Interim Guidelines for Lower Basin Shortages and the Coordinated Operations for Lake Powell and Lake Mead (May 2024) |
| G | Letter from the Governors' Representatives of the Seven Colorado River Basin States to Carly Jerla, Bureau of Reclamation (Sep. 1, 2022) |
| H | Letter from the Governors' Representatives of Arizona, California, and Nevada to Commissioner Touton (Mar. 6, 2024) |
| I | Letter from the Governors' Representatives of Arizona, California, and Nevada to Commissioner Touton (June 25, 2024) |
| J | Letter from the Governors' Representatives of Arizona, California, and Nevada to Secretary Burgum (Feb. 13, 2025), including Attachment 1 |
| K | Arizona's Comments on the Draft Environmental Impact Statement (Mar. 2, 2026) |
| L | Lower Division States' Proposal for Short-Term Operations of the Colorado River (May 1, 2026) |
| M | Arizona's Comments on the Final Environmental Impact Statement (Aug. 10, 2026) |