# EXHIBIT 3
## Complaint in Intervention for Declaratory and Injunctive Relief

MORRISON LAW
Gregory H. Morrison (NV Bar No. 12454)
36 Stewart Street, Suite 204
Reno, NV 89501
Telephone: (775) 413-6022
greg@morrisonlawnevada.com

CENTRAL ARIZONA WATER
CONSERVATION DISTRICT
Jay M. Johnson (AZ Bar No. 015122)
*Pro Hac Vice Pending*
Gregory L. Adams (AZ Bar No. 024997)
*Pro Hac Vice Pending*
23636 North 7th Street
Phoenix, AZ 85024
Telephone: (623) 869-2124
jjohnson@cap-az.com
gadams@cap-az.com

SOMACH SIMMONS & DUNN
A Professional Corporation
Stuart L. Somach (CA Bar No. 90959)
*Pro Hac Vice Pending*
Brittany K. Johnson (CA Bar No. 282001)
*Pro Hac Vice Pending*
Theresa C. Barfield (CA Bar No. 185568)
*Pro Hac Vice Pending*
Yosef M. Negose (CA Bar No. 361755)
*Pro Hac Vice Pending*
Maximilian C. Bricker (CA Bar No. 350150)
*Pro Hac Vice Pending*
500 Capitol Mall, Suite 1000
Sacramento, CA 95814
Telephone: (916) 446-7979
ssomach@somachlaw.com
bjohnson@somachlaw.com
tbarfield@somachlaw.com
ynegose@somachlaw.com
mbricker@somachlaw.com

Attorneys for Plaintiff-Intervenor
CENTRAL ARIZONA WATER
CONSERVATION DISTRICT

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEVADA**

STATE OF NEVADA, COLORADO RIVER COMMISSION OF NEVADA, and SOUTHERN NEVADA WATER AUTHORITY,

Plaintiffs,

vs.

DOUG BURGUM, in his official capacity as Secretary of the Department of the Interior, U.S. DEPARTMENT OF THE INTERIOR, a federal agency, U.S. BUREAU OF RECLAMATION, an agency within the U.S. Department of the Interior, and AUBREY BETTENCOURT, in her official capacity exercising the delegated authority of the Commissioner of the U.S. Bureau of Reclamation,

Defendant.

Case No. 2:26-cv-02665-GMN-NJK

**COMPLAINT IN INTERVENTION FOR DECLARATORY AND INJUNCTIVE RELIEF**

Judge: Gloria M. Navarro
Magistrate Judge: Nancy J. Koppe

Action Filed: Aug. 24, 2026

Plaintiff-Intervenor Central Arizona Water Conservation District, brings this Complaint in Intervention for declaratory and injunctive relief against Defendants U.S. Department of the Interior, U.S. Bureau of Reclamation, Secretary of the Interior Douglas Burgum, and Deputy Commissioner of the U.S. Bureau of Reclamation Aubrey Bettencourt, asserting as follows:

**INTRODUCTION**

1. The new operating guidelines for the Colorado River—the challenged agency actions in this case—authorize the Defendants to reduce the water supply from the mainstream Colorado River to Central and Southern Arizona to zero. These deep and devastating shortages are disproportionately imposed upon Plaintiff-Intervenor Central Arizona Water Conservation District (CAWCD), the local agency that operates, maintains, and delivers water through the Central Arizona Project (CAP). The shortages authorized under the new operating guidelines result from the failure to ensure that enough water is released from storage from Lake Powell and other federal reservoirs on the Colorado River to meet deliveries at Lee Ferry required under the Colorado River Compact of 1922 (Compact). Defendants U.S. Department of the Interior (Interior), U.S. Bureau of Reclamation (Reclamation), Secretary of the Interior (Secretary) Douglas Burgum, and Deputy Commissioner of the U.S. Bureau of Reclamation Aubrey Bettencourt (collectively "Federal Defendants") ignored their obligations to operate Lake Powell and other federal reservoirs on the Colorado River to store and release water in compliance with the Compact, and instead chose an operations framework that withholds water in storage in the Upper Basin, creating conditions resulting in extreme shortages in the Lower Basin.

2. The Colorado River Compact is the foundational authority of the "Law of the River." The Compact is an agreement among the seven Colorado River Basin States: the States of Arizona, California, Colorado, Nevada, New Mexico, Utah, and Wyoming each ratified the Compact, consenting to its terms. The Compact is also federal law: the United States Congress approved the Compact, adopting it as a federal statute. The States of Arizona, California and Nevada are the Lower Division States. The States of Colorado, New Mexico, Wyoming and Utah are the Upper Division States. The Colorado River is governed by many statutory, regulatory, and contractual authorities and by international treaty. These authorities are collectively referred

to as the "Law of the River." The Law of the River authorities all expressly provide that their terms are subject to the Compact and are controlled by the Compact. Determination of Colorado River operations must start with the Compact.

3. The challenged agency actions here are the guidelines for Reclamation's coordinated operations of Lake Mead and Lake Powell for the next ten years. Reclamation first issued its Final Environmental Impact Statement for the Post-2026 Operational Guidelines and Strategies for Lake Powell and Lake Mead in July 2026 (Final EIS). In the Final EIS, Reclamation analyzed various alternatives for coordinated operations of Lake Mead and Lake Powell. Among these options, Reclamation chose its Preferred Alternative in the August 21, 2026 Record of Decision on the "Decision Framework for Colorado River Guidelines: Coordinated Operations of Lake Powell and Lake Mead (2027-2036)" ("ROD" or "Decision Framework"). Reclamation then issued the "Operating Guidelines, Colorado River Guidelines for Coordinated Operations of Lake Powell and Lake Mead, Operating Years 2027 and 2028" (August 2026) (2027-2028 Operating Guidelines) that describe the specific coordinated operations of Lake Mead and Lake Powell, the determination of shortage for Arizona, California, and Nevada (Lower Division States) and their respective water users, and storage and delivery of conserved water in Lake Mead or Lake Powell.

4. Rather than starting with a solid foundation of Compact compliance, these agency actions fail to ensure that sufficient water is released from storage in reservoirs in the Upper Basin and delivered at Lee Ferry. Reclamation did not include alternatives in the Final EIS that ensured compliance with the Compact, despite repeated requests from representatives of the Lower Division States to include alternatives that do so. Without providing for releases of stored water from Lake Powell and other federal reservoirs in the Upper Basin to meet the Compact delivery at Lee Ferry, the ROD and 2027-2028 Operating Guidelines that were adopted based on the Final EIS necessarily violate the Compact and other authorities that are premised upon compliance with the Compact. This foundational error must be corrected before CAWCD and other water users in the Lower Division States suffer the consequences of extreme and devastating shortages.

**PARTIES**

5. Plaintiff-Intervenor CENTRAL ARIZONA WATER CONSERVATION DISTRICT (CAWCD) is a municipal corporation and a multi-county water conservation district in Arizona governed by a board of elected representatives from Maricopa, Pima, and Pinal counties. CAWCD manages and operates the CAP. The water supply for the CAP includes "third priority" and "fourth priority" water, which totals approximately 1.5 million acre-feet annually. The CAP delivers this water supply from the mainstream Colorado River to Central and Southern Arizona. CAWCD's service area encompasses more than 6 million people, or approximately 80 percent of Arizona's population, and in years of a full water supply, up to one million acres of irrigated agriculture. CAWCD also facilitates water deliveries for 11 federally recognized tribes in Arizona with entitlements to CAP water, supporting multiple congressionally approved tribal water right settlement agreements. CAWCD receives Colorado River water through various contracts with the United States, including Contract No. 14-06-W-245 dated December 15, 1972, as amended, for the delivery of Mainstream Water for the Central Arizona Project (Master Repayment Contract).

6. Defendant DOUG BURGUM is Secretary of the Interior and is ultimately responsible for implementing and complying with federal laws governing the operations of Lake Mead, Lake Powell, and other federally operated reservoirs authorized under the Colorado River Storage Project Act and the Colorado River Basin Project Act. He is sued in his official capacity.

7. Defendant U.S. DEPARTMENT OF THE INTERIOR is the department within the executive branch that has supervisory control over Reclamation and is responsible for implementing and complying with federal laws relating to the operations of Lake Mead, Lake Powell, and other federally operated reservoirs authorized under the Colorado River Storage Project Act and the Colorado River Basin Project Act.

8. Defendant AUBREY J.D. BETTENCOURT, the Principal Deputy Commissioner for Reclamation, exercising the delegated authority of the Commissioner of Reclamation, is responsible for implementing and complying with federal laws relating to the operations of Lake Mead, Lake Powell, and other federally operated reservoirs authorized under the Colorado River

Storage Project Act and the Colorado River Basin Project Act. She is sued in her official capacity.

9. Defendant U.S. BUREAU OF RECLAMATION is the agency within Interior that is responsible for implementing and complying with federal laws relating to the operations of Lake Mead, Lake Powell, and other federally operated reservoirs authorized under the Colorado River Storage Project Act and the Colorado River Basin Project Act.

## JURISDICTION AND VENUE

10. This action arises under the Administrative Procedure Act, 5 U.S.C. §§ 701-705; the Colorado River Storage Project Act, 43 U.S.C. §§ 620-620o; the Colorado River Basin Project Act, 43 U.S.C. §§ 1501-1556; and the National Environmental Policy Act, 42 U.S.C. §§ 4321-4370h.

11. This Court has jurisdiction over this action, which arises under the laws of the United States. 28 U.S.C. § 1331.

12. The challenged actions are subject to judicial review under the Administrative Procedure Act. The Administrative Procedure Act waives federal sovereign immunity and allows parties harmed by final federal agency actions to challenge those actions in federal court. 5 U.S.C. §§ 702, 704.

13. The Administrative Procedure Act directs reviewing courts to "hold unlawful and set aside" agency actions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority or limitations, or short of statutory right; or without observance of procedure required by law. 5 U.S.C. § 706(2)(A)-(D).

14. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 1361, 2201-2202, and 5 U.S.C. §§ 705-706.

15. Venue is proper under 28 U.S.C. § 1391(e)(1). This civil action is brought against agencies of the United States and officers and employees of the United States acting in their

official capacities. A substantial part of the events giving rise to the claims occurred in the District of Nevada.

**LEGAL BACKGROUND ON COLORADO RIVER AUTHORITIES**

16. The Compact is an interstate compact among the seven Colorado River Basin States. It is a federal statute approved by Congress. 70 Cong. Rec. 324 (1928); *see also* 43 U.S.C. § 617l. Each Basin State ratified the Compact, signifying their consent to its terms. *See* Ariz. Rev. Stat. § 45-1311 (2026); Colo. Rev. Stat. § 37-61-101 (2026); Nev. Rev. Stat. Ann. § 538.010 (2025); N.M. Stat. Ann. § 72-15-5 (2026); Utah Code Ann. § 73-12a-2 (2026); Wyo. Stat. Ann. § 41-12-301 (2026); *see also* 1929 Cal. Stat., ch. 16 at 38-39 (ratifying the Compact on terms specified in the California Limitation Act).

17. Article III(a) of the Compact apportions water from the Colorado River System between the Upper Basin and Lower Basin. Article III(c) of the Compact states that any right of Mexico to the water of the Colorado River System:

> shall be supplied first from the waters which are surplus over and above the aggregate of the quantities specified in paragraphs (a) and (b); and if such surplus shall prove insufficient for this purpose, then, the burden of such deficiency shall be equally borne by the Upper Basin and the Lower Basin, and whenever necessary the States of the Upper Division shall deliver at Lee Ferry water to supply one-half of the deficiency so recognized in addition to that provided in paragraph (d).

Article III(d) of the Compact provides that the "States of the Upper Division will not cause the flow of the river at Lee Ferry to be depleted below an aggregate of 75,000,000 acre-feet for any period of ten consecutive years reckoned in continuing progressive series beginning with the first day of October next succeeding the ratification of this compact." Article III(e) of the Compact provides that the "States of the Upper Division shall not withhold water, and the States of the Lower Division shall not require the delivery of water, which cannot reasonably be applied to domestic and agricultural uses."

18. The Boulder Canyon Project Act of 1928 ratified the Compact and authorized construction of Hoover Dam. Pub. L. No. 70-642, 45 Stat. 1057 (1928) (codified at 43 U.S.C. §§ 617-617t). It authorized the Secretary to enter into contracts with water users in the Lower Basin for the storage of water in the project, including the amounts approved for an

apportionment among the Lower Basin States, including 2.8 million acre-feet for Arizona, 4.4 million acre-feet for California, and 300,000 acre-feet for Nevada. Section 13 of the Boulder Canyon Project Act states that all rights or contracts to water of the Colorado River shall be subject to and controlled by the Compact. 43 U.S.C. § 617l. Thus, water delivery contracts with Lower Basin water users for water from the mainstream Colorado River, including CAWCD's contract with the United States, and tribal water delivery contracts executed pursuant to congressionally approved water right settlement agreements are all subject to and controlled by the Compact. This is also true for contracts that Reclamation executed with water users for project water from federal reclamation projects in the Upper Basin.

19. The Mexican Water Treaty of 1944 provides that Mexico is entitled to 1.5 million acre-feet annually, except that, in the event of extraordinary drought, the water allotted to Mexico will be reduced in the same proportion as consumptive uses in the United States are reduced. Treaty Between the United States of America and Mexico Respecting Utilization of Waters of the Colorado and Tijuana Rivers and of the Rio Grande, Mex.-U.S., Feb. 3, 1944, 59 Stat. 1219, T.S. No. 994.

20. In 1956, Congress passed the Colorado River Storage Project Act, 43 U.S.C. §§ 620-620o, which authorized a comprehensive water development plan for the Upper Basin, including the construction of the "Upper Initial Units": Lake Powell created by Glen Canyon Dam in Arizona, Flaming Gorge Unit in Utah, Wayne N. Aspinall Unit in Colorado, and Navajo Unit in New Mexico. The Colorado River Storage Project Act also authorized construction of the "Participating Projects": federal reservoirs across the Upper Colorado River Basin that store water for municipal, industrial, and agricultural use, and that generate hydropower. The Colorado River Storage Project Act provides that nothing in the "Act shall be construed to alter, amend, repeal, construe, interpret, modify, or be in conflict with the provisions of[,]" *inter alia*, "the Colorado River Basin Compact." 43 U.S.C. § 620h. Further,

> In the operation and maintenance of all facilities, authorized by Federal law and under the jurisdiction and supervision of the Secretary of the Interior, in the basin of the Colorado River, the Secretary of the Interior is directed to comply with the applicable provisions of the Colorado River Compact, the Upper Colorado River Basin Compact, the Boulder Canyon Project Act, the Boulder Canyon Project

> Adjustment Act, and the Treaty with the United Mexican States [59 Stat. 1219], in the storage and release of water from reservoirs in the Colorado River Basin.

*Id.* § 620m. Thus, the storage and release of water from federal reservoirs in the Colorado River Basin, including the Upper Initial Units, must be in compliance with the Compact.

21. In 1963, the U.S. Supreme Court decided *Arizona v. California*, 373 U.S. 546 (1963). The Court also confirmed the Lower Basin's mainstream apportionments of 2.8 million acre-feet for Arizona, 4.4 million acre-feet for California, and 300,000 acre-feet for Nevada. The Court acknowledged Colorado River rights held by Indian tribes and other federal reservations. The Court entered a decree in *Arizona v. California* that enjoins the Secretary's release of water controlled by the United States in the Lower Basin according to listed priorities and based on the entitlements set forth in the decree. 376 U.S. 340 (1963). In 2006, the Court entered the latest version of the decree, summarizing the entry of supplemental decrees that implement the subsequent decisions of the Court. *Arizona v. California*, 547 U.S. 150 (2006). This is known as the "Consolidated Decree."

22. In 1968, Congress enacted the Colorado River Basin Project Act. Pub. L. No. 90-537, 82 Stat. 885 (1968) (codified at 43 U.S.C. §§ 1501-1556). Section 602(a) directs the Secretary "to comply with and carry out the provisions of the Colorado River Compact, the Upper Colorado River Basin Compact, and the Mexican Water Treaty" by developing "criteria for the coordinated long-range operation" of federally authorized Colorado River reservoirs. *Id.* § 1552(a). Section 602(a) also lists the priorities for "the storage of water in storage units of the Colorado River storage project and releases of water from Lake Powell": (1) *first*, releases to supply treaty obligations to Mexico referenced in Article III(c) of the Compact; (2) *second*, releases to comply with and carry out Article III(d) of the Compact; and (3) *third*, release of carryover storage that is not needed to meet the first and second priorities to the extent the Secretary finds it reasonably necessary to assure deliveries under the first or second priorities "without impairment" of consumptive use in the Upper Basin. *Id.* § 1552(a)(1)-(3). Congress

also authorized construction of the CAP in section 301 of the Colorado River Basin Project Act. *Id*. § 1521. Under section 601(c) of the Colorado River Basin Project Act,

> All Federal officers and agencies are directed to comply with the applicable provisions of this Act, and of the laws, treaty, compacts, and decree referred to in subsection (a) of this section, in the storage and release of water from all reservoirs and in the operation and maintenance of all facilities in the Colorado River system under the jurisdiction and supervision of the Secretary, and in the operation and maintenance of all works which may be authorized hereafter for the augmentation of the water supply of the Colorado River system . . .

43 U.S.C. §1551(c).

23. The Paria River, a tributary to the Colorado River, joins the mainstream Colorado River below Glen Canyon Dam and above Lee Ferry. Paria River inflow plus releases from Glen Canyon Dam plus accretions below Glen Canyon Dam above Lee Ferry are the sources of water that contribute to flow at Lee Ferry. Pursuant to section 602(a) of the Colorado River Basin Project Act, the United States promulgated the "Long-Range Operating Criteria" (LROC). The LROC set an objective "to maintain a minimum release of water from Lake Powell of 8.23 million acre-feet" per year, or a greater amount "if necessary to deliver [75 million] acre-feet at Lee Ferry for the 10-year period ending September 30, 1972." Colorado River Reservoirs Coordinated Long-Range Operation, 35 Fed. Reg. 8951 (June 10, 1970) (art. II(2)(b)). The United States modified the LROC in 2005 and reiterated at that time that "the objective shall be to maintain a minimum release of water from Lake Powell of 8.23 million acre-feet per year" in times of shortage. 70 Fed. Reg. 15873, 15875 (Mar. 29, 2005) (art. II(2)(b)).

24. In 2007, the United States issued a Record of Decision for Colorado River Interim Guidelines for Lower Basin Shortages and the Coordinated Operations for Lake Powell and Lake Mead. Secretary of the Interior, Record of Decision on Colorado River Interim Guidelines for Lower Basin Shortages and the Coordinated Operations for Lake Powell and Lake Mead (Dec. 2007) (2007 Interim Guidelines). The United States based the guidelines on a "remarkable consensus" among stakeholders, including the Governor's representatives of the seven Colorado River Basin States. *Id*. at 1.

25. Among other things, the consensus-backed 2007 Interim Guidelines used surface elevation thresholds or "tiers" to determine how water would be stored and released. The 2007

Interim Guidelines stated that the Secretary "never" previously declared a shortage condition on the Colorado River because the flow therein had been sufficient to supply 7.5 million acre-feet of annual consumptive use in the Lower Division States. The 2007 Interim Guidelines also committed the Secretary to consult with the seven Colorado River Basin States on details of how the Secretary would implement the guidelines. The United States executed many implementing agreements with numerous stakeholders, including CAWCD, at or around the time the United States finalized and began implementing the guidelines.

26. In 2019, the seven Colorado River Basin States collaborated on the development of the Drought Contingency Plans (DCP): the Upper Basin Drought Contingency Plan (Upper Basin DCP), which affects operations above Lee Ferry, and the Lower Basin Drought Contingency Plan (Lower Basin DCP), which affects operations below Lee Ferry. As with the 2007 Interim Guidelines, the collective consent of the seven Colorado River Basin States served as the legal and political foundation for the DCP.

27. Due to the worsening drought, Reclamation issued a supplemental environmental impact statement (SEIS) and record of decision in May 2024, providing operational guidelines for the coordinated operations of Lake Mead and Lake Powell under low reservoir conditions. These operational guidelines under the 2024 record of decision modified the 2007 Interim Guidelines and were effective through the end of the 2026 water year.

28. Operations under the 2007 Interim Guidelines, DCP, and 2024 SEIS and record of decision are set to expire at the end of water year 2026.

## LEGAL BACKGROUND ON NEPA

29. NEPA uses "action-forcing" procedures to compel federal agencies to "take a 'hard look' at environmental consequences" before undertaking major federal actions that will affect the environment. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (citation omitted). NEPA's core procedural provision requires agencies to prepare a "detailed statement," known as an "Environmental Impact Statement" or "EIS," in connection with such actions. 42 U.S.C. § 4332(2)(C).

30. An EIS must discuss, *inter alia*, the "reasonably foreseeable environmental effects of the proposed agency action[,]" 42 U.S.C. § 4332(2)(C)(i), and "any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented[.]" 42 U.S.C. § 4332(2)(C)(ii).

31. An EIS must include a "reasonably complete discussion of possible mitigation measures." *See Robertson*, 490 U.S. at 351-52. An EIS's failure to include such a discussion violates NEPA. *See Neighbors of Cuddy Mt. v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998); *Coal. for Canyon Pres. v. Slater*, 33 F. Supp. 2d 1276, 1280 (D. Mont. 1999).

32. An EIS must analyze a no action alternative. 42 U.S.C. § 4332(2)(C)(iii). Analysis of the "no-action alternative" is at the heart of the NEPA process; thus, failure to provide a valid one casts a shadow over the process as a whole. *Conservation Nw. v. Sherman,* 715 F.3d 1181, 1188 (9th Cir. 2013).

33. An EIS must address "a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal[.]" 42 U.S.C. § 4332(2)(C)(iii). The agency's legal authority to perform the proposed action is highly relevant to the purpose and need for the action and the scope of alternatives the agency must consider. *See League of Wilderness Defs.,-Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 689 F.3d 1060, 1070 (9th Cir. 2012); *Nat'l Parks & Conservation Ass'n v. BLM*, 606 F.3d 1058, 1070 (9th Cir. 2010) ("an agency should always consider the views of Congress, expressed, to the extent that the agency can determine them, in the agency's statutory authorization to act, as well as in other congressional directives") (citation omitted).

34. An EIS violates NEPA if it fails to consider a reasonable and viable alternative that is more consistent with the purpose and need for the proposed federal action than the alternatives that were the subject of final consideration. *See* 42 U.S.C. § 4332(2)(C)(iii); *Se. Alaska Conservation Council v. Fed. Highway Admin.*, 649 F.3d 1050, 1056 (9th Cir. 2011); *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 813 (9th Cir. 1999).

**RECENT COLORADO RIVER OPERATIONS UNDER MULTI-YEAR DROUGHT CONDITIONS**

35. Since 2000, the Colorado River Basin has experienced multi-year drought conditions and declining reservoir levels. The Lower Division States and water users have taken voluntary forbearance actions under the Intentionally Created Surplus program and other programs to reduce consumptive use and contribute to storage in Lake Mead. However, prolonged drought and operational decisions by Reclamation with respect to the release and storage of water from Lake Powell and the Upper Initial Units have resulted in reduced flows at Lee Ferry.

36. Based on the releases from Lake Powell during water year 2026 and the planned releases for water years 2027 and 2028, and the planned reductions for deliveries to Mexico for water years 2027 and 2028, on information and belief, and on that basis CAWCD alleges, flows at Lee Ferry have dropped and will remain below the amount required to be delivered under Articles III(c) and III(d) of the Compact.

37. Despite low elevations at Lake Powell, on information and belief, and on that basis CAWCD alleges, at the start of water year 2027, the Upper Initial Units have a combined 8.71 million acre-feet held in storage that can be released consistent with the existing records of decisions for long-term operations of those reservoirs. When including Participating Projects, at the start of water year 2027, over 10 million acre-feet is held in storage in reservoirs authorized and constructed under the Colorado River Storage Project Act.

**DEVELOPMENT OF POST-2026 OPERATING GUIDELINES**

38. On June 16, 2023, Reclamation issued the notice of intent to "Prepare an Environmental Impact Statement and Notice to Solicit Comments and Hold Public Scoping Meetings on the Development of Post-2026 Operational Guidelines and Strategies for Lake Powell and Lake Mead." 88 Fed. Reg. 39455 (June 16, 2023). On August 15, 2023, the Lower Basin States submitted joint scoping comments regarding the same. On October 20, 2023, Reclamation issued its notice of availability of its "Scoping Summary Report on the Development

of Post-2026 Operational Guidelines and Strategies for Lake Powell and Lake Mead." 88 Fed. Reg. 72535 (Oct. 20, 2023).

39. On January 17, 2025, Reclamation released a document titled "Alternatives Report: Post-2026 Operational Guidelines and Strategies for Lake Powell and Lake Mead" (Alternatives Report). In a February 13, 2025 letter to the Interior regarding the Alternatives Report, the Lower Basin States submitted comments, emphasizing:

> The analysis and modeling of compliance with the Colorado River Compact of 1922 (the "Compact") in all alternatives is mandatory pursuant to NEPA's informed decision-making and public disclosure requirements and is critical to understanding the real-world implications of each alternative. Doing so could encourage development of a consensus-based approach. However, Reclamation's failure to interpret and disclose application of the Law of the River, particularly the implications of a likely Compact Call, falls short of the minimum requirements of NEPA and leaves stakeholders to speculate regarding Reclamation's intentions regarding future Colorado River operations during low-flow conditions.

40. In January 2026, Reclamation released the Draft Environmental Impact Statement for the Post-2026 Operational Guidelines and Strategies for Lake Powell and Lake Mead (Draft EIS). Notice of Availability, 91 Fed. Reg. 2131 (Jan. 16, 2026).

41. On March 2, 2026, CAWCD submitted detailed comments on Reclamation's Draft EIS. A true and correct copy of the Cover Letter, Attachment 1, and Attachment 2 of CAWCD's comment letter is attached as **Exhibit A**. CAWCD's comments contended, among other things, that the no action alternative discussion, reasonable range of alternatives discussion, and reasonably foreseeable effects discussion all violated NEPA. The comments also contended that Reclamation's failure to reasonably explain its interpretation of its own legal authority threatened agency action that would exceed such authority and thereby violate the Administrative Procedure Act. CAWCD also expressed its support for including and implementing the "Lower Basin Alternative," the proposal submitted by the Lower Division States, with agreed upon reductions to Lower Division State apportionments under most system conditions. Under the Lower Basin Alternative, reductions to Arizona would be 760,000 acre-feet.

42. On July 31, 2026, Reclamation released the Final EIS and preferred alternative. 91 Fed. Reg. 48385 (July 31, 2026). The Final EIS did not cure the deficiencies identified by CAWCD in its comments on the Draft EIS.

43. On August 21, 2026, the Secretary, through Interior and Reclamation, issued the ROD. A true and correct copy of the ROD is attached as **Exhibit B**. Also on August 21, 2026, the Secretary, through Interior and Reclamation, issued the 2027-2028 Operating Guidelines. A true and correct copy of the 2027-2028 Operating Guidelines is attached as **Exhibit C**.

## OPERATIONS AND SHORTAGES UNDER THE FINAL EIS AND ROD

44. Reclamation included the following alternatives in the Final EIS: the Preferred Alternative, the No Action Alternative, the Basin Coordination Alternative, the Enhanced Coordination Alternative, the Maximum Operational Flexibility Alternative, and the Supply Driven Alternative.

45. The alternatives in the Draft EIS and the Final EIS are contrary to the Compact. Although Reclamation includes an analysis of the probable deliveries at Lee Ferry under different hydrological conditions and different alternatives in the Final EIS, the alternatives do not include operating parameters that demonstrate sufficient water will flow into Lake Powell and be released from Lake Powell to satisfy Lee Ferry deliveries as required under Article III(c) and III(d) of the Compact.

46. Rather than enforce the Compact and require minimum releases from Lake Powell to meet Compact deliveries, Reclamation analyzes releases from Lake Powell based on infrastructure protection at Glen Canyon Dam. In the No Action Alternative, Reclamation admits that under the LROC, the objective is to maintain a minimum release of 8.23 million acre-feet and that shortages to the Lower Basin would be limited to 600,000 acre-feet. Final EIS at ES-35, 2-18, 3-46, 4-28, 18-11; ROD at 11. In the other alternatives in the Final EIS, Reclamation prioritizes keeping Lake Powell above an elevation 3,500 feet, which provides a 10-foot buffer above elevation 3,490 feet. Elevation 3,490 feet is the elevation below which water can only be released through the river outlet works. Elevation 3,490 feet is also the minimum power pool at which hydropower generation at Glen Canyon Dam is no longer feasible. By protecting elevation

3,490 feet at Lake Powell and refusing to operate Lake Powell at lower elevations, approximately 3.74 million acre-feet of water that is in Lake Powell below 3,490 feet is held in storage and becomes unavailable for release to the Lower Basin for Compact deliveries. By protecting elevation 3,490 feet at Lake Powell and refusing to operate Lake Powell at lower elevations, Reclamation prioritizes hydropower generation over releases of water necessary to satisfy deliveries required under Article III(c) and III(d) of the Compact.

47. Reclamation represents that it first discovered damage in the Glen Canyon Dam river outlet works (also known as bypass tubes) in April 2023 when it conducted a "High Flow Experiment" release to rebuild beaches and sandbars on the Colorado River. On March 26, 2024, Reclamation released a "Technical Decision Memorandum," explaining that the April 2023 release and other High Flow Experiment releases in 1996, 2004, 2008, 2012, 2013, 2014, 2016, 2018, and 2023 from the river outlet works, combined with flood control releases in 1984 and 1987, had over time caused cavitation, which damaged the original coal tar enamel lining. In the Technical Decision Memorandum and subsequent press releases, Reclamation represented that long-term options to address the risk of additional cavitation when operating at low reservoir levels would be part of the development of interim operating guidance. Despite public comments from Lower Division States and water users, including CAWCD, Reclamation presents no short-term or long-term solution in the Final EIS to fix the infrastructure limitations at Glen Canyon Dam and instead relies on prioritizing the protection of minimum power pool at Glen Canyon Dam at elevation 3,490 feet, with at least a 10-foot buffer.

48. More recent public statements from Interior officials in 2026 are contrary to the 2024 Technical Decision Memorandum and indicate that the river outlet works are able to be used continuously with more frequent inspections and maintenance but maintaining Lake Powell above 3,500 feet remains Reclamation's priority for long-term system performance, hydropower, and infrastructure health.

49. Reclamation also fails to incorporate releases from Upper Initial Units in a manner required by law in the Final EIS. Instead, Reclamation considers coordinated operations of the Upper Initial Units to "release additional water within their respective Records of Decision

(RODs) to increase the elevation at Lake Powell." Final EIS at 1-9. The Final EIS alternatives do not include operating parameters for the Upper Initial Units that ensure a sufficient amount of water is released from the Upper Initial Units to flow into Lake Powell so that a sufficient amount of water is released from Lake Powell to satisfy the required delivery at Lee Ferry under Article III(c) and III(d) of the Compact. Reclamation only proposes to move water from the Upper Initial Units for the explicit purpose of increasing elevations at Lake Powell and protection of elevation 3,490 feet, not for the purposes of releasing water from Lake Powell to meet Lee Ferry deliveries. The Final EIS even labels these releases from the Upper Initial Units as "Powell infrastructure protection (PIP) releases." Final EIS at O-1.

50. The Final EIS alternatives consider shortage allocations among the Lower Division States and their respective water users in a Shortage Condition when the Secretary determines that insufficient mainstream water is available to satisfy 7.5 million acre-feet of consumptive use in the Lower Division States. Reclamation's Shortage Allocation Model (SAM) models how shortages are distributed among the Lower Division States and their water users. The modeling assumptions for the SAM are summarized in Appendix C of the Final EIS.

51. In the Final EIS, Reclamation considers two approaches to distributing shortages: "LB Priority" and "LB Pro Rata." Under the Enhanced Coordination Alternative, for example, the Secretary would allocate shortages amongst the Lower Division States on a pro rata basis, and the maximum shortage of 3.0 million acre-feet would be distributed as follows: Arizona (930,000 acre-feet); California (1.47 million acre-feet); Nevada (100,000 acre-feet); Mexico (500,000 acre-feet). Final EIS at 2-20, 3-46, C-147-148. In contrast, under the Preferred Alternative, the Secretary would distribute shortages among the Lower Division States based on a distribution developed by the Lower Division in 2027-2028, and then for 2029-2036, the distribution of shortage would be based on an interpretation of priority. For 2027-2028, based on an anticipated voluntary agreement by the Lower Division States, the 1.25 million acre-feet shortages would be distributed as follows: Arizona (760,000 acre-feet); California (440,000 acre-feet); Nevada (50,000 acre-feet); Mexico (250,000 acre-feet). Final EIS at 2-11, 2-17, 3-46. For 2029-2036, the maximum shortage of 3.6 million acre-feet would be distributed as follows:

Arizona (1.96 million acre-feet); California (900,000 acre-feet); Nevada (210,000 acre-feet); Mexico (600,000 acre-feet). Final EIS at ES-35, 3-46.

52. When shortages are distributed among the Lower Division States based on Reclamation's interpretation of priority in the Final EIS, a Lower Basin shortage of 2.0 million acre-feet or more equates to a shortage for 4th priority CAP subcontractors of 1.3 million acre-feet. Final EIS at C-48. At that level of shortage, the allocation of water to some of CAP's municipal subcontractors is reduced to zero. *Compare* Final EIS at C-44 to C-45 *with* Final EIS at C-60.

53. Conversely, when shortages are distributed among the Lower Division States pro rata, a Lower Basin shortage of 600,000 acre-feet equates to a shortage for 4th priority CAP subcontractors of 90,000 acre-feet. A Lower Basin shortage of 3.5 million acre-feet equates to a shortage for 4th priority CAP subcontractors of 510,000 acre-feet. Final EIS at C-147.

54. Thus, the distribution of shortage among the Lower Division States on a pro rata basis, rather than based on the interpretation of priority in "LB Priority" in the SAM, has tremendous impacts on the water supply delivered to Central and Southern Arizona through the CAP.

55. The ROD is based on the Preferred Alternative analyzed in the Final EIS and the assumptions developed to analyze the Preferred Alternative. In the ROD, Reclamation also discusses a Representative Preferred Alternative, which refers to the set of modeling assumptions designed around the Preferred Alternative sideboards to approximate a range of operating guidelines that could be adopted. ROD at 13.

56. In the ROD, Interior and Reclamation establish the operational principles, sideboards, and process to govern the development and issuance of operating guidelines for the coordinated operations of Lake Powell and Lake Mead for two-year intervals. The ROD states that consensus agreements can be implemented within the analyzed ranges of the operations sideboards for the ROD. If there is no consensus agreement, the ROD states that the Secretary will determine and issue operating guidelines for two-year intervals based on the operational principles, sideboards, and the modeling assumptions contained in the Final EIS. ROD at 29.

57. Interior and Reclamation purport to implement the long-range operating criteria required under section 602(a) of the Colorado River Basin Project Act through the ROD.

58. At the time of the adoption of the ROD, the seven Colorado River Basin States had not reached an agreement on an operational approach to the coordination operations of Lake Powell and Lake Mead.

59. With respect to the distribution of shortages, under the ROD, Interior will determine the amount of water available for consumptive use from Lake Mead for Arizona, California, and Nevada under Normal (7.5 million acre-feet), Surplus (above 7.5 million acre-feet), or Shortage (below 7.5 million acre-feet) for purposes of the Consolidated Decree, and will determine the approach to the coordinated operations of Lake Powell and Lake Mead. ROD at 3-4. In a Shortage Condition, shortages under the Representative Preferred Alternatives are distributed preliminarily based on an anticipated voluntary agreement by the Lower Division States for water years 2027 and 2028, and "a representation of applicable law applied for shortages exceeding 1.5 [million acre-feet] in 2027-2028 and after 2028." *Id.* at 13. Absent a consensus agreement, the ROD states that the Secretary will apportion shortages "according to the Law of the River" and the "assumptions contained in the Final EIS." *Id.* at 29. The "assumptions contained in the Final EIS" are the assumptions used to model the Representative Preferred Alternative, which distributes shortages based on "LB Priority" and takes CAP to zero under the deepest reductions among the Lower Division States.

60. For the 2027 and 2028 water years, the 2027-2028 Operating Guidelines state that the Secretary will determine a Shortage Condition and apportion 6.25 million acre-feet among the Lower Division States of which 2.04 million acre-feet is apportioned to Arizona, 3.96 million acre-feet is apportioned to California, and 250,000 acre-feet is apportioned to Nevada. This reflects reductions of 760,000 acre-feet in Arizona, 440,000 acre-feet in California, and 50,000 acre-feet in Nevada, in accordance with a Lower Basin implementing agreement. Absent a consensus agreement, the Secretary will apportion 6.25 million acre-feet among the Lower Division States "in accordance with applicable law."

61. With respect to releases from Lake Powell, Interior and Reclamation state the following operational principles for Lake Powell in the ROD: "When Lake Powell is projected to fall below elevation 3,500 feet[ ] or when Lake Mead is projected to fall below elevation 1,000 feet,[ ] processes and tools will be used to manage risks to infrastructure and prevent damage to Federal facilities of regional and national importance." ROD at 26 (footnotes omitted). The operational sideboards for the coordinated reservoir operations include a Lake Powell water year release of 5 to 12 million acre-feet "to provide protection for critical infrastructure at Glen Canyon Dam, while meeting other operational objectives consistent with applicable Federal law, and sufficiently high releases necessary to prevent spill avoidance releases." ROD at 27. The range of Lake Powell releases will be announced in operating guidelines for two-year intervals.

62. For the 2027 and 2028 water years, the 2027-2028 Operating Guidelines provide for the planned releases at different elevation ranges at Lake Powell: Upper Elevation Range, Mid-Elevation Range, and Low Elevation Infrastructure Protection Range. At the Low Elevation Infrastructure Protection Range, when the projected October 1 Lake Powell elevation is below 3,540 feet, the initial water year release will first assume a release of 7.0 million acre-feet. In each range, the release from Lake Powell can be reduced to a minimum of 6 million acre-feet to maintain elevation of 3,510 feet. The 2027-2028 Operating Guidelines also require the Secretary to consult with the Colorado River Basin States to discuss potential actions if the elevation of Lake Powell is projected to decline below 3,500 feet any time from the then-current month through March of the following year, which includes the express option of reducing releases from Lake Powell down to 5.0 million acre-feet.

63. With respect to the Upper Initial Units, the operational sideboards considered by Interior and Reclamation in the ROD state the "[p]otential for maximum use of CRSP Upper Initial Units within their respective RODs to release additional water if needed to protect critical infrastructure." ROD at 27.

**IMPACTS TO CAP BASED ON REDUCTIONS AUTHORIZED UNDER THE ROD**

64. Reclamation's Final EIS alternatives propose severe policy shortages that would reduce the total deliverable supply of water through the CAP. These water supply scenarios would be devastating to CAP and the people in Arizona that it serves. Yet, the Draft EIS barely mentioned these impacts, and the Final EIS did nothing to update the impact analysis in response to comments.

65. The CAP is federally owned infrastructure that cost billions of dollars to construct and is operated, maintained, and managed by CAWCD. The CAP infrastructure was not intended to withstand extended periods of low water levels or dry-ups within the system, but instead was designed and constructed by Reclamation with the assumption that water would be present in CAP's infrastructure continually. The long-term health of CAP's physical systems—including the 336 miles of concrete-lined canal, 15 pumping plants, mechanical equipment, electrical equipment, high-voltage electrical systems, and major siphons—relies heavily on the stabilizing and protective effects of continuous water presence and regular operational cycles. Using CAWCD's decades of experience operating and maintaining the CAP, CAWCD estimates that in the event of a 12-month dry-up period where no water is available to be diverted into the CAP, a scenario contemplated under the Representative Preferred Alternative, the costs of returning the CAP back to service would be approximately $358 million. It would also take 12 to 24 months to return the canal, concrete canal lining, mechanical and electrical systems at the pumping plants, high voltage systems, siphons, and other equipment to service. This means even <u>one year</u> where insufficient water flows through the CAP may cause of up <u>two years</u> of downtime for the canal, thus leaving Central and Southern Arizona without Colorado River water for up to <u>three years</u> at a price tag of over $358 million. Reclamation did not adequately analyze this reasonably foreseeable impact of implementing the Preferred Alternative.

66. The CAP delivers Colorado River water to dozens of municipal water providers and industrial customers in Central and Southern Arizona. Several of those customers own and operate drinking water treatment plants that are designed and located to process CAP Colorado River water exclusively. An extended dry-up or period of extreme shortage will likely cause

significant damage to these treatment plants as alternative water sources will not be readily available to provide the supply to those facilities due to physical, technical, and legal constraints. Reclamation failed to adequately analyze these impacts in the Draft EIS and Final EIS, or determine the total annual diversion volumes required to avoid the impacts to critical infrastructure in the Lower Basin (as opposed to infrastructure protection at Glen Canyon Dam).

67. The CAP currently operates as a fast moving, low trophic system that supports stable biological communities and reliable water quality. Reductions in flow as proposed in the Preferred Alternative will result in dramatic changes to these natural systems and will cause environmental impairment and dangers to public health. Reductions in flow below a 700,000 acre-feet CAP allocation increase the risk of steep changes in biological conditions that can lead to odors, insect breeding, harmful algal blooms, fish kills, and the expansion of nuisance or invasive species. The most significant risks, particularly those involving cyanotoxins and mosquito borne disease, become more pronounced between allocations of 500,000 and 300,000 acre-feet. At 300,000 acre-feet, the CAP faces a heightened risk of compounding impacts that would affect water quality, public health, and system reliability. Reclamation did not adequately consider and mitigate for these impacts in the Final EIS.

68. The economic impacts of the extreme shortages proposed in the Preferred Alternative for the CAP service area would be devastating to Central Arizona's economy. CAP provided an Economic Impact Report as part of its detailed comments on the Draft EIS. The full economic analysis of the proposed shortages shows that water supply impacts to the CAP service area begin immediately as providers draw down groundwater and long-term storage credits (LTSCs) to replace CAP supplies. Scarcity drives up wholesale water prices, making it harder for providers to acquire alternative water supplies, LTSCs, or groundwater to replace CAP supplies. New housing developments are constrained due to challenges in securing an assured water supply. For some providers, insufficient supplies to meet demand for existing customers will begin as early as 2030 and expand over time as backup supplies are exhausted. Consumers and existing businesses face significant supply interruptions, leading to household welfare losses and

reduced business activity. Water providers face substantial revenue shortfalls resulting from reduced water sales. The economic impact through 2060 is in the trillions of dollars.

**CHALLLENGES TO THE FINAL EIS, ROD, AND 2027-2028 OPERATING GUIDELINES**

69. On August 24, 2026, the State of Nevada, the Colorado River Commission of Nevada, and Southern Nevada Water Authority (collectively, "Nevada") filed a complaint challenging the Final EIS, ROD, and the 2027-2028 Operating Guidelines. Dkt. No. 1. Nevada alleges that all three actions violate the Administrative Procedure Act because they are contrary to the Law of the River and NEPA and are arbitrary and capricious. Nevada asks this Court to vacate the Final EIS, ROD, 2027-2028 Operating Guidelines, and enjoin the implementation of each action.

70. On October 16, 2026, the State of Arizona, by and through the Director of the Arizona Department of Water Resources (Arizona), filed a motion to intervene in this action, accompanied by a proposed complaint in intervention for declaratory and injunctive relief under the Administrative Procedure Act. Although Arizona agrees that the Final EIS, ROD, and 2027-2028 Operating Guidelines violate the Law of the River, it does not agree with every allegation in Nevada's complaint, in particular the allegations related to the distribution of shortage between Arizona and Nevada. Arizona also requests different relief than Nevada, in part. Arizona does not ask for vacatur of the 2027-2028 Operating Guidelines, alleging that if the 2027-2028 Operating Guidelines are vacated, Arizona and other Colorado River Basin water users will have no guidance on how Reclamation plans to administer Lake Mead, Lake Powell, and other federally operated reservoirs on the Colorado River for the next two years.

71. As a multi-county water conservation district specially created under the laws of the State of Arizona, CAWCD has a unique interest in this action. CAWCD has a Section 5 contract with the United States—its Master Repayment Contract—for the diversion of water from the Colorado River, to which the State of Arizona is not a party. As a fourth priority contract holder in Arizona, the interpretation of priority and distribution of shortage among the Lower Division States directly affects the available water supply for CAP's subcontractors and the tribal

contractors with allocations of CAP water. Under the interpretation of priority modeled in the Representative Preferred Alternative, CAP's fourth priority water supply is reduced to zero when shortages imposed on the Lower Division States of 2.0 million acre-feet or more. This decimates the Colorado River supply available for the municipal and industrial water users in Central and Southern Arizona. Such shortages disproportionately harm Arizona and are devastating to CAP.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

### Violation of Section 14 of the Colorado River Storage Project Act, Section 601(c) of the Colorado River Basin Project Act, and the Administrative Procedure Act

### The ROD and 2027-2028 Operating Guidelines Do Not Comply With Articles III(c) and III(d) of the Compact

72. CAWCD repeats, realleges, and incorporates the allegations in the paragraphs above as though fully set forth herein.

73. A final agency action "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C), or a final agency action found to be "not in accordance with law," *id.* § 706(2)(A), violates the Administrative Procedure Act.

74. The ROD and the 2027-2028 Operating Guidelines are final agency actions subject to the Administrative Procedure Act. *See* 5 U.S.C. § 704.

75. Section 14 of the Colorado River Storage Project Act, 43 U.S.C. § 620m, and section 601(c) of the Colorado River Basin Project Act, 43 U.S.C. §1551(c), require all federal officers and agencies to comply with the Compact in the storage and release of water from all reservoirs and in the operation and maintenance of all facilities in the Colorado River system under the jurisdiction and supervision of the Secretary.

76. The ROD and the 2027-2028 Operating Guidelines are not in accordance with law and are in excess of statutory jurisdiction and authority because they authorize operations of Lake Mead, Lake Powell, and other federally operating reservoirs in violation of the Compact.

77. The ROD and the 2027-2028 Operating Guidelines allow for operating decisions related to the storage and release of water from Lake Powell and the Upper Initial Units that do

not ensure a sufficient amount of water is delivered at Lee Ferry in compliance with Article III(c) and III(d) of the Compact.

78. When deliveries at Lee Ferry are not in compliance with Article III(c) and III(d) of the Compact, CAWCD suffers injury from reduced water supply available for the Lower Division States. CAWCD has been and will continue to be injured by implementation of the ROD and 2027-2028 Operating Guidelines.

**SECOND CAUSE OF ACTION**

**Violation of Section 602(a) of the Colorado River Basin Project Act and the Administrative Procedure Act**

**The ROD and 2027-2028 Operating Guidelines Do Not Comply With Section 602(a) of the Colorado River Basin Project Act**

79. CAWCD repeats, realleges, and incorporates the allegations in the paragraphs above as though fully set forth herein.

80. A final agency action "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C), or a final agency action found to be "not in accordance with law," *id.* § 706(2)(A), violates the Administrative Procedure Act.

81. A final agency action that is found to be "arbitrary and capricious" or "an abuse of discretion" violates the Administrative Procedure Act. 5 U.S.C. § 706(2)(A).

82. The ROD and the 2027-2028 Operating Guidelines are final agency actions subject to the Administrative Procedure Act. *See* 5 U.S.C. § 704.

83. Section 602(a) of the Colorado River Basin Project Act directs the Secretary "to comply with and carry out the provisions of the Colorado River Compact, the Upper Colorado River Basin Compact, and the Mexican Water Treaty" by developing "criteria for the coordinated long-range operation" of federally authorized Colorado River reservoirs. 43 U.S.C. § 1552(a). Section 602(a) also mandates certain priorities for "the storage of water in storage units of the Colorado River storage project and releases of water from Lake Powell": (1) *first*, releases to supply treaty obligations to Mexico referenced in Article III(c) of the Compact; (2) *second*, releases to comply with and carry out Article III(d) of the Compact; and (3) *third*, release of carryover storage that is not needed to meet the first and second priorities to the extent the

Secretary finds it reasonably necessary to assure deliveries under the first or second priorities "without impairment" of consumptive use in the Upper Basin. . 43 U.S.C. § 1552(a)(3).

84. The ROD and the 2027-2028 Operating Guidelines serve as criteria for the coordinated long-range operation of reservoirs under section 602(a) of the Colorado River Basin Project Act.

85. The LROC promulgated in 1970 included a minimum release of water from Lake Powell of 8.23 million acre-feet that enabled the Secretary to meet demands in the order of priorities that Congress specified in section 602(a) of the Colorado River Basin Project Act and supply Mexico and the Lower Basin with enough water to avoid a violation of Article III(c) and III(d) of the Compact. In 2005, the Secretary promulgated revisions to the LROC but continued to include a minimum release that enabled the Secretary to meet demands in the order of priorities that Congress specified in section 602(a) of the Colorado River Basin Project Act.

86. Without a consensus agreement, the ROD and 2027-2028 Operating Guidelines change the decades-old interpretation of section 602(a)'s storage requirements from the interpretation promulgated in the LROC. The Final EIS, ROD, and 2027-2028 Operating Guidelines do not explain or justify the Secretary's significant departure from the longstanding interpretation of section 602(a)'s storage requirements.

87. As criteria for coordinated long-range operation of Lake Mead and Lake Powell, the ROD and the 2027-2028 Operating Guidelines are not in accordance with law and are in excess of statutory jurisdiction and authority because they do not comply with the mandatory priorities in section 602(a) of the Colorado River Basin Project Act. Section 602(a) mandates the release of water from storage in Lake Powell and the Upper Initial Units to ensure a sufficient amount of water is delivered at Lee Ferry in compliance with Article III(c) and III(d) of the Compact—before any additional water is stored in Lake Powell or the Upper Initial Units. Section 602(a) also mandates the release of water from storage in Lake Powell and the Upper Initial Units to satisfy deliveries under the Compact over operations that maximize hydropower generation at Glen Canyon Dam and the Upper Initial Units. The ROD and 2027-2028 Operating Guidelines do not comply with these statutory mandates or the LROC.

88. The ROD and 2027-2028 Operating Guidelines are arbitrary, capricious and an abuse of discretion because Interior and Reclamation did not explain their departure from a decades-old interpretation of section 602(a) of the Colorado River Basin Project Act's storage requirements in the LROC. Unexpected inconsistencies and policy shifts are grounds for holding an agency interpretation to be arbitrary and capricious.

89. When sufficient water is not released from storage from Lake Powell and the Upper Initial Units, and deliveries at Lee Ferry are not in compliance with Article III(c) and III(d) of the Compact, CAWCD suffers injury from reduced water supply available for the Lower Division States. CAWCD has been and will continue to be injured by implementation of the ROD and 2027-2028 Operating Guidelines.

## THIRD CAUSE OF ACTION

### Violation of Section 14 of the Colorado River Storage Project Act, Section 601(c) of the Colorado River Basin Project Act, and the Administrative Procedure Act

### The Secretary has Failed to Act in Accordance With His Nondiscretionary Duty to Operate the Upper Initial Units to Satisfy Compact Deliveries

90. CAWCD repeats, realleges, and incorporates the allegations in the paragraphs above as though fully set forth herein.

91. Under the Administrative Procedure Act, a reviewing court "shall compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

92. Construction of the Upper Initial Units was authorized under the Colorado River Storage Project Act. The authorized purposes of the Upper Initial Units are to ensure Compact deliveries at Lee Ferry before all other authorized purposes. The Secretary has a nondiscretionary duty to operate the Upper Initial Units in compliance with their congressionally authorized purposes.

93. Interior and Reclamation have operated, managed, and controlled, and continue to operate, manage, and control, the Upper Initial Units to maintain the reservoirs at near full-capacity for hydropower generation, recreation interests, and environmental purposes.

94. The ROD and 2027-2028 Operating Guidelines violate the Secretary's nondiscretionary duty to operate the Upper Initial Units to release a sufficient amount of water

from storage from the Upper Initial Units to meet delivery requirements at Lee Ferry under Articles III(c) and III(d) of the Compact.

95. When sufficient water is not released from storage from Lake Powell and the Upper Initial Units, and deliveries at Lee Ferry are not in compliance with Article III(c) and III(d) of the Compact, CAWCD suffers injury from reduced water supply available for the Lower Division States. CAWCD has been and will continue to be injured by implementation of the ROD and 2027-2028 Operating Guidelines.

**FOURTH CAUSE OF ACTION**

**Violation of the Colorado River Basin Project Act and the Administrative Procedure Act**

**The Distribution of Shortages Among the Lower Division States in the ROD and 2027-2028 Operating Guidelines Erroneously Interprets the Colorado River Basin Project Act**

96. CAWCD repeats, realleges, and incorporates the allegations in the paragraphs above as though fully set forth herein.

97. A final agency action "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C), or a final agency action found to be "not in accordance with law," *id.* § 706(2)(A), violates the Administrative Procedure Act.

98. A final agency action that is found to be "arbitrary and capricious" or "an abuse of discretion" violates the Administrative Procedure Act. 5 U.S.C. § 706(2)(A).

99. The ROD and the 2027-2028 Operating Guidelines are final agency actions subject to the Administrative Procedure Act. *See* 5 U.S.C. § 704.

100. Section 301(b) of the Colorado River Basin Project Act provides that the Secretary shall administer the Consolidated Decree in years when "as determined by the Secretary, there is insufficient mainstream Colorado River water available for release to satisfy the annual consumptive use of [7.5 million] acre-feet in Arizona, California and Nevada," diversions from the mainstream for CAP:

> shall be so limited as to assure the availability of water in quantities sufficient to provide for the aggregate annual consumptive use by holders of present perfected rights, by other users of the State of California served under existing contracts with the United States by diversion works heretofore constructed, and by other

existing Federal reservations in that State of [4.4 million] acre-feet of mainstream water, and by users of the same character in Arizona and Nevada.

101. The ROD and the 2027-2028 Operating Guidelines choose to impose shortage on CAWCD and the CAP water supply, eliminating the CAP water supply entirely in extreme drought conditions, rather than establish operating parameters to ensure sufficient water will flow into Lake Powell and be released from Lake Powell to satisfy Lee Ferry deliveries as required under Article III(c) and III(d) of the Compact. This decision based on the agencies' erroneous interpretation of priority under section 301(b) of the Colorado River Basin Project Act under which CAWCD can be shorted and reduced to zero before any action is required in the Upper Basin to conserve water, before stored water is released from federal reservoirs in the Upper Basin, and before hydropower generation at Glen Canyon Dam is reduced. The alternatives in the Final EIS disproportionally harm Arizona and place the risk of dry hydrological conditions, reservoir operations, and inaction by the Upper Division States almost entirely on the CAP water supply.

102. The plain language of section 301(b) is limited to the relative priority of CAP, other specific water users, and the State of California as it relates to deliveries of water under the Consolidated Decree, which by its terms "shall not affect . . . [a]ny issue of Colorado River Compact interpretation." *See* Consolidated Decree, 547 U.S. 150, 153 (2006). By enacting section 301(b) of the Colorado River Basin Project Act, Congress did not implicitly or explicitly modify the Compact. The Colorado River Basin Project Act was thus premised upon Compact compliance and required that any limitations on CAP diversions under section 301(b) only be imposed after ensuring Lee Ferry deliveries to the Lower Basin in compliance with the Compact. Section 301(b) did not alter the Upper Basin's delivery obligations under the Compact, and thus Section 301(b) cannot be reasonably interpreted as a basis for ignoring Compact compliance, as was the case in the Final EIS alternatives.

103. The ROD and the 2027-2028 Operating Guidelines are not in accordance with law and are in excess of statutory jurisdiction and authority because the agency actions distribute shortage among the Lower Division States based on an erroneous interpretation of section 301(b)

of the Colorado River Basin Project Act. Rather than ensuring Compact deliveries at Lee Ferry, Interior and Reclamation adopted operating guidelines that choose not to make sufficient water available to the Lower Basin when in its physically available in the Upper Basin, stored in the Upper Initial Units, or held in storage in Lake Powell to protect infrastructure and hydropower generation at Glen Canyon Dam. Section 301(b) does not authorize the Secretary to impose an agency-created shortage on Arizona and the CAP.

104. CAWCD suffers injury from reduced water supply available for the Lower Division States based on the erroneous interpretation of section 301(b) of the Colorado River Basin Project Act in the ROD and 2027-2028 Operating Guidelines. CAWCD has been and will continue to be injured by implementation of the ROD and 2027-2028 Operating Guidelines.

## FIFTH CAUSE OF ACTION

### Violation of the National Environmental Policy Act and the Administrative Procedure Act

### The Final EIS and ROD Fails to Meet the Requirements of the National Environmental Policy Act

105. CAWCD repeats, realleges, and incorporates the allegations in the paragraphs above as though fully set forth herein.

106. A final agency action "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C), or a final agency action found to be "not in accordance with law," *id.* § 706(2)(A), violates the Administrative Procedure Act.

107. A final agency action that is found to be "arbitrary and capricious" or "an abuse of discretion" violates the Administrative Procedure Act. 5 U.S.C. § 706(2)(A).

108. The ROD and the 2027-2028 Operating Guidelines are final agency actions subject to the Administrative Procedure Act. *See* 5 U.S.C. § 704.

109. Challenges to final agency actions based on violations of NEPA are brought under the Administrative Procedure Act.

110. NEPA requires that an EIS discuss the "reasonably foreseeable environmental effects of the proposed agency action[,]" 42 U.S.C. § 4332(2)(C)(i); include a reasonably complete discussion of possible mitigation measures; analyze a no-action alternative, *id.*

§ 4332(2)(C)(iii); and address "a reasonable range of alternatives to the proposed agency action," *id.*

111. An EIS violates NEPA if it fails to consider a reasonable and viable alternative that is more consistent with the purpose and need for the proposed federal action than the alternatives that were the subject of final consideration. *See* 42 U.S.C. § 4332(2)(C)(iii).

112. The Final EIS fails to meet the requirements of NEPA for the following reasons:

a. The Final EIS did not adequately discuss the reasonably foreseeable and devastating environmental, infrastructure, water supply, and economic effects of the extreme shortages it considers imposing on CAWCD and the CAP water supply in the alternatives, and the Final EIS does not consider the devastating effects of CAP's ability to deliver water to tribal contractors with allocations of CAP water pursuant to tribal water settlements;

b. The Final EIS did not include a reasonably complete discussion of possible mitigation measures;

c. The Final EIS did not include a reasonable range of alternatives because no alternative in the Final EIS includes operating parameters that ensure a sufficient amount of water is delivered at Lee Ferry in compliance with Article III(c) and III(d) of the Compact;

d. The Final EIS did not include and consider the reasonable and viable alternative presented by the Lower Division States that is more consistent with the purpose and need of the federal action than the alternatives that were the subject of final consideration; and

e. The Final EIS did not include and consider a reasonable and viable alternative to fix the infrastructure limitations at Glen Canyon Dam that is more consistent with the purpose and need of the federal action than the alternatives that were the subject of final consideration.

113. CAWCD has a significant interest in judicial enforcement of NEPA procedures under which Interior and Reclamation must consider and document alternatives to depleting the

CAP water supply. CAWCD is injured by the agencies' failure to comply with the requirements of NEPA when it adopted the Final EIS, ROD, and 2027-2028 Operating Guidelines.

**PRAYER FOR RELIEF**

For these reasons, CAWCD respectfully requests that the Court enter judgment in its favor against Defendants and grant the following relief:

A. A declaration that the Final EIS, ROD, and the 2027-2028 Operating Guidelines are arbitrary, capricious, or otherwise not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A); in excess of statutory jurisdiction, authority, or limitations, or short of statutory right within the meaning of 5 U.S.C. § 706(2)(C); and without observance of procedure required by law within the meaning of 5 U.S.C. § 706(2)(D);

B. An order vacating and setting aside the Final EIS and ROD in their entirety pursuant to the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C), (D);

C. An order remanding without vacating the 2027-2028 Operating Guidelines for reconsideration in light of the judgment in this case, so long as the 2027-2028 Operating Guidelines implement the shortage distribution reflected in the Lower Basin Alternative and limit Arizona's reduction to 760,000 acre-feet for water years 2027-2028;

D. An order enjoining Defendants and their officers, employees, and agents from enforcing, implementing, applying, or taking any action whatsoever under the Final EIS and ROD after 2028, and any other injunctive relief as may be necessary; and

E. Any other relief as the Court deems just and equitable.

Respectfully submitted,

MORRISON LAW

DATED: October 27, 2026

By [signature]
Gregory H. Morrison
Attorneys for Plaintiff-Intervenor
CENTRAL ARIZONA WATER CONSERVATION DISTRICT

CENTRAL ARIZONA WATER CONSERVATION DISTRICT

DATED: October 27, 2026

By _______________________________

Jay M. Johnson
Gregory L. Adams
Attorneys for Plaintiff-Intervenor
CENTRAL ARIZONA WATER CONSERVATION DISTRICT

SOMACH SIMMONS & DUNN
A Professional Corporation

DATED: October 27, 2026

By _______________________________

Stuart L. Somach
Brittany K. Johnson
Theresa C. Barfield
Yosef M. Negose
Maximilian C. Bricker
Attorneys for Plaintiff-Intervenor
CENTRAL ARIZONA WATER CONSERVATION DISTRICT

## INDEX OF EXHIBITS

| Exhibit | Description |
|---|---|
| A | CAWCD Comments on the Draft Environmental Impact Statement for Post-2026 Operational Guidelines and Strategies for Lake Powell and Lake Mead (Mar. 2, 2026) (Cover letter, Attachment 1, and Attachment 2) |
| B | Record of Decision - Decision Framework for Colorado River Guidelines: Coordinated Operations of Lake Powell and Lake Mead (2027-2036) (August 2026) |
| C | Operating Guidelines - Colorado River Guidelines for Coordinated Operations of Lake Powell and Lake Mead Operating Years 2027 and 2028 (August 2026) |